15132

EASLER *ET AL.* v. BLACKWELL *ET AL.*

(10 S. E. (2d), 160)

16

February, 1940.

*Messrs. Donald Russell* and *R. B. Paslay,* for petitioners,

*Messrs. J. Davis Kerr* and *Osborne, Butler & Moore,* for respondent,

July 22, 1940.

The opinion of the Court was delivered by MR. J. HENRY JOHNSON, ACTING ASSOCIATE JUSTICE.

*Certiorari* to the Board of State Canvassers, wherein, by petition filed in the original jurisdiction of this Court, petitioners challenge the action of that board in sustaining the validity of an election for school trustees in Saxon School District, Spartanburg County, held December 12, 1939, upon the order of the Governor and agreeable to mandate of this tribunal in *Easler v. Maybank,* 191 S. C., 511, 5 S. E. (2d), 288.

As a part of the history of the cause, it may not be amiss to advert to the fact that the effort to elect trustees for the aforementioned district, following the passage of Act Number 872 of the Acts of 1938 (Act April 12, 1938, 40 Stat. at Large, 1775), has produced litigation of such a nature as to render necessary four appeals to this Court—see *Hawk-*

*ins v. Carroll et al.,* 190 S. C., 11, 1 S. E. (2d), 898, 126 A. L. R., 1028; *Corn v. Blackwell et al.,* 191 S. C., 183, 4 S. E. (2d), 254, and *Easler v. Maybank, supra*—and it is desired that the adjudication in the instant cause may point the way to an end of misunderstanding of the law applicable to elections, to carelessness in many instances in the conduct thereof, due no doubt, in large measure, to what may be termed a "One-Party-System" in this commonwealth, and to further expensive litigation resulting therefrom.

The record certified here discloses that there were six candidates for the three trusteeships at stake; that 690 ballots were cast, and that the result was so close that the successful candidate receiving the greatest number of votes had a total of 347, while the unsuccessful candidate obtaining the fewest number received 336 votes, the other four candidates procuring 346, 346, 344 and 339, respectively; that the polls were kept open for approximately two hours beyond the advertised (and legal) hour of closing, that, perhaps, as many as 150 ballots were cast during that period, of which approximately 125 were voted by persons who reached the polls after the legal hour of closing; that, of the total number of voters participating in the election, more than 100 were permitted to vote upon the production of registration certificates issued by a single member of the Board of Registration for Spartanburg County at the offices of two of the mills in Saxon School District, which certificates were not signed by the members of that Board, although their names were affixed thereto by means of a rubber stamp; that 14 ballots in excess of the number of voters entered upon the poll lists were deposited in the ballot box, of which nine were destroyed because, in lieu of striking or scratching the names of three of the candidates, the voters of such ballots placed a cross-mark (X) after the names of three candidates, while the other five were counted; that a number of voters did not sleep in the district; and that two persons who had not paid poll tax were permitted to vote.

It is gratifying to discover, however, that there is neither charge nor evidence of any fraud in the conduct of the election, nor even the slightest suggestion thereof, and that petitioners' attack upon its validity is based solely upon the alleged irregularities enumerated.

But, while the true purpose of an election is to ascertain and declare the will of the majority, and when that is obtained in a free and fair contest the Courts will not interfere because of mere irregularities which do not appear to have affected the result, many decisions of this Court confirm the rule that irregularities, sufficient to cause doubt as to the result, will nullify an election. *Johnston v. City of Charleston*, 1 Bay, 441; *Gunter v. Gayden*, 84 S. C., 48, 65 S. E., 948; *Davis v. State Board of Canvassers*, 86 S. C., 451, 68 S. E., 676; *Clarke v. McCown*, 107 S. C., 209, 92 S. E., 479; *Abernathy v. Wolfe*, 117 S. C., 545, 109 S. E., 275; *Callison v. Peeples*, 102 S. C., 256, 86 S. E., 635, Ann. Cas., 1917-E, 469. And such irregularities may resu't either from the counting of illegal ballots, or from the refusal to count legal ballots. *Davis v. State Board, supra.*

In determining whether or not irregularities in the conduct of an election are sufficient to render the result doubtful, the rule deducible from the decisions is that all illegally cast ballots shall be deducted from the total number counted for the declared winning candidate, and that all rejected (uncounted), legal ballots shall be added to the total number counted for the declared losing candidate. *Johnston v. City of Charleston, supra; Davis v. State Board, supra.*

In the election now under attack, because of the closeness of the vote for the several candidates, and the terms of the Act under which the election was held—it being provided that the person receiving the highest number of votes should have a term of three years, the second highest a term of two years, and the third highest a term of one year—the

deduction of two (illegal) votes from the highest candidate, or the addition of two (uncounted, legal) votes to the admitted total of either of the other two candidates who were declared to have been elected, would affect the length of the terms of at least two of the three candidates declared elected, and thereby affect the result of the election. Moreover, as there was a difference of only two votes between two of the candidates said to have been elected, and the highest, unsuccessful candidate, a deduction of only three votes from either of the former, or the addition of that number to the total counted for the latter, would have changed the result. So, also because only eleven votes separated the highest (347) and lowest (336) candidates, the deduction of twelve (illegally counted) votes from the three highest candidates, or the addition of twelve (uncounted, legal) votes to the totals actually counted for the three defeated candidates would reverse entirely the result of the election—as a matter of fact, the nine ballots destroyed by the managers could have elected two of the defeated candidates, if they were legal ballots, provided all of them were cast for those candidates; indeed, the counting of the other five ballots (found in the box in excess of the number of voters entered upon the poll lists) may have affected the result as to the highest unsuccessful candidate.

Unquestionably, two voters were illegally permitted to vote without the payment of their poll tax. One was held to be exempt from the payment of such tax because he was a ministerial student, while the other, a young man of the age of twenty-three years, was excused upon the theory, apparently, that he had not theretofore attained his majority for a sufficient length of time anterior to the election to require the payment of poll tax. Nowhere do we find any justification in law for the action of the managers in permitting those voters to participate in the election, and, while it is a fact that both the County and State Boards of Canvassers sustained the action of the managers, findings of fact

by the State Board of Canvassers are not conclusive where there is no evidence to support the finding, or where it is against the necessary inference from the facts. *Callison v. Peeples et al., supra.* Since these two votes could have affected the result of the election, and as it is impossible to purge them, their reception is sufficient to invalidate the election.

Probably the most serious objection to the validity of the election is that which complains of the reception of ballots, certainly more than 100, after the advertised, and legal, hour of closing, the record establishing beyond question that voters were permitted to cast their ballots for approximately two hours after the ballot box should have been closed. As a matter of fact, the box was, in effect, closed about the proper hour, 4 o'clock, p. m., but, after the lapse of ten or fifteen minutes, the managers reopened the polls, and kept them open so long as anyone wanted to vote. If managers may keep open the polls for two hours beyond the statutory hour of closing, why not for four hours, or for twenty-four? Such a practice, if permitted, might result in fraud or favoritism, and cannot be countenanced; a reasonably faithful compliance with the statute must be observed. The action of the managers in this election cannot be justified or excused, even though there is no suggestion of fraud.

The announced conclusions render unnecessary a consideration of the remaining exceptions, which involve incidents not apt to arise, and which should not occur, in the next election. It may not be unwise, however, to remind those charged with the conduct of elections in this jurisdiction that the statute (Sec. 2309, Code of 1932), provides that, "If more ballots shall be found on opening the box than there are names on the poll list, all the ballots shall be returned to the box and thoroughly mixed together, and one of the managers, or the clerk, shall, without seeing the ballots, draw therefrom and immediately destroy as many ballots as there are in excess of the number of names on the

poll list"; that there are no "official ballots" in a general election in this State (*Gardner v. Blackwell,* 167 S. C., 313, 166 S. E., 338; *Rawl v. McCown,* 97 S. C., 1, 81 S. E., 958, 959); that no particular method for the voting, or "scratching", of ballots is required under the existing statutes, so long as the intention of the voter can be ascertained from the method employed by him; that the placing of a "checkmark" on the ballot opposite the name of a candidate is an indication of whom the voter desired to vote for (*Zimmerman v. Bennett,* 154 S. C., 116, 151 S. E., 214); and that the "residence" of a person is a mixed question of law and fact, and "the intention of that person with regard to the matter is deemed the controlling element of decision." *Clarke v. McCown,* 107 S. C., 209, 92 S. E., 479, 480. While many definitions of the word "resident" are to be found in the decisions, and although it is difficult to announce a wholly satisfactory definition of the term, it has always seemed to the writer of this opinion that a resident should be regarded as "one who has a residence", as distinguished from one who has a place of business, or a place where he earns his living; as "one who abides, or dwells, or lives", in a particular place, as distinguished from one who merely "works" in a certain locality, or in a certain place of business; and that one is a resident of that place where he makes his home, rather than of the place where he makes his living, or works when his home and his place of work are in different localities; and it is the opinion of the writer hereof that when the General Assembly limited the right to vote for trustees of Saxon School District to the "qualified resident electors of said district", the intention was to limit such right of suffrage to those "qualified electors" only who were "residents" of such district; who made their homes within such district, who had their residences there, as distinguished from their places of business, who abided there, who dwelled there, who lived there, as distinguished from those who merely worked within the district, who only earned their livelihood there.

The true purpose of statutory construction is to determine the legislative intent (*State v. Stevens,* 173 S. C., 149, 175 S. E., 213), and each enactment of that body is to be construed in the light of its own context (*State v. Electric Co.,* 112 S. C., 528, 100 S. E., 355). In *Clarke v. McCown, supra,* construction of the term "qualified elector" was involved; here, we are concerned with the construction of the term "only qualified resident electors", and it would seem that, whether wisely or not is no concern of ours, the legislative intent was to limit the right of election to those citizens who had their homes, their residences, their places of abode, their dwelling places, the places where they lived, within Saxon School District—all, as distinguished from those citizens who merely had their places of business, or places of work, within the district; for, when one maintains his home, his abode, his place of living and sleeping, in one locality, and his place of business, or work, in a different locality, it would seem that he is more nearly a "resident" of the former than of the latter. In any event, in order to lend full assistance to an effort to terminate litigation, this Court should give its construction to the term "qualified resident electors of said district."

For the reasons stated, the decision of the Board of State Canvassers is hereby reversed. Let another election, agreeable to the decision in *Easler v. Maybank, supra,* be ordered.

Petition granted.

MR. CHIEF JUSTICE BONHAM, MESSRS. JUSTICES CARTER and FISHBURNE and MR. ACTING ASSOCIATE JUSTICE E. H. HENDERSON concur.