17894

F. C. CREAMER, Jake Hand and others similarly situated, Respondents, v. The CITY OF ANDERSON, et al., of whom The City of Anderson, S. C., James M. Cathcart, Mayor of the City of Anderson, S. C., Clarence Ellison, George S. Mack, Ralph P. Sewell, U. H. Burton, Clarence L. Pressley, W. H. Embler and Rufus H. Moorhead, Councilmen of the City of Anderson, S. C., are, Appellants.

(124 S. E. (2d) 788)

*Messrs. Watkins, Vandiver, Freeman & Kirven,* of Anderson, *for Appellants,*

*Messrs. Leatherwood, Walker, Todd & Mann,* of Greenville, *for Respondents,*

*Messrs. Watkins, Vandiver, Freeman & Kirven,* of Anderson, *for Appellants, in Reply,*

April 3, 1962.

LEGGE, Acting Justice.

In this action plaintiffs challenged the official result of a special election held on October 27, 1959, to extend the

corporate limits of the City of Anderson (Code, 1952, Title 47, Chapter 1, Article 2), contending that less than the required number of the votes legally cast in the area proposed to be annexed to the city were in favor of the annexation. Code, 1952, Section 47-17. The Special Referee having rejected this contention and the plaintiffs having excepted to his report, the matter was then heard by the Honorable George T. Gregory, Jr., presiding in the Tenth Judicial Circuit. From his decree dated May 24, 1961, sustaining the exceptions and adjudging the election ineffectual, the City of Anderson and its Mayor and Councilmen have appealed. The County Commissioners of Election, who had been joined as defendants, were not affected by the relief sought, did not actively defend, and have not appealed.

Appellants state in their brief that the ultimate issue here is whether a majority of the votes legally cast in the area sought to be annexed were in favor of annexation. Construing the duplicitous wording of Section 47-17 in appellant's favor for the purposes of this appeal, the ultimate issue would seem to be not whether a majority, but whether as many as one-half, of the legal votes favored annexation. A preliminary issue concerns the contention of the appellants that the circuit judge erred in permitting the complaint to be amended to show the result of the election in the area in question as certified by the Commissioners of Election. Plaintiffs' motion to so amend had been denied by the Special Referee.

The complaint alleged, upon information and belief, that the vote in the area proposed to be annexed had been certified to the City Council of Anderson by the Commissioners of Election as having stood 1,579 in favor of and 1,501 against, annexation. This allegation was expressly admitted in the answer of the City, its Mayor, and its Councilmen. Actually, the certification by the Commissioners of Election had shown 1,569 votes in favor of, and 1,500 against, annexation.

Plaintiffs' motion to amend was made at the close of the testimony, was resisted by the defendants, and was denied by the Special Referee upon the following grounds:

1. That the time limited by Section 47-22 for beginning an action to contest such an election (*i. e.,* ninety days after the declaration of the result) had expired; and

2. That to allow the amendment at that stage of the proceeding would prejudice the defendants' case.

The gist of the plaintiffs' cause of action as alleged in the complaint upon information and belief was "that said election is null and void and of no effect because there were a sufficient number of illegal ballots cast in the area proposed to have been annexed to have altered and affected the outcome of said election in said area * * * (and) that said ballots were illegal because they were cast * * * by persons who were either not properly registered and qualified in the precinct at which they cast their ballots, not properly registered or qualified in any precinct, and/or were not registered qualified electors residing within the territory proposed to be annexed to the City of Anderson, South Carolina".

The allegation as to the number of votes certified by the Commissioners of Election as having been cast for and against annexation in the area sought to be annexed was evidentiary in character and not essential to the statement of the plaintiffs' cause of action. Amendment to correctly state the number of votes so certified would not have stated a different cause of action; the limitation prescribed by Section 47-22 was not applicable.

The defendants, appellants here, were in no position to contend that the proposed amendment would prejudice their case or take them by surprise. It was to them that the official results of the election had been certified by the Commissioners shortly thereafter.

The proposed amendment was properly allowed by the circuit judge in consonance with the general rule that favors the amendment of pleadings in further-

ance of justice and the determination of controversies on their real facts. Cf. *Braudie v. Richland County,* 217 S. C. 57, 59 S. E. (2d) 548; *Elrod v. Elrod,* 230 S. C. 109, 94 S. E. (2d) 237; *Wood v. Hardy,* 235 S. C. 131, 110 S. E. (2d) 157.

As before stated, the official record of the election as certified by the Commissioners showed that there were cast, in the area sought to be annexed, 1,569 votes in favor of, and 1,500 against, annexation. Votes illegally cast must be deducted from the winning side. *Johnston v. Corporation of City of Charleston* (1795), 1 Bay (1 S.C.L.) 441; *State ex rel. Davis v. State Board of Canvassers* (1910), 86 S. C. 451, 68 S. E. 676; *Easler v. Blackwell* (1940), 195 S. C. 15, 10 S. E. (2d) 160. In *Johnston v. Corporation of City of Charleston, supra,* where the election of a city warden had been challenged, the court, approving this rule, stated the reason for it thus:

"As to the mode adopted by the council in deducting the bad votes from the highest candidate, it was perhaps the best general rule that could be adopted; for if after such deduction he had still a majority then his election would stand unimpeached; but if after the deduction the next candidate had an equal or greater number of votes than the other, so as to make it a doubtful case which of them really and truly had the greatest number of unquestionable votes; then, according to the principles of a free government and the rights of the people, it ought to be sent back to the people at large to determine finally on the point."

It is apparent, then, that under the rule before stated if as many as seventy (70) votes were illegally cast, the result of the election would be affected, for the required number in favor of the annexation would have been lacking. At the conclusion of all of the testimony the defendants conceded that fifty-seven (57) of the challenged votes had been illegally cast and should be subtracted from the vote for annexation.

The Special Referee found that in addition to these fifty-seven (57) there were seven (7) votes cast in the area outside of the city by persons who had never lived there and who were at the time of the election and had been for a long time prior thereto residents of the City of Anderson, and that their votes were therefore illegal. Six (6) of these votes had been cast in one precinct; one (1) in the other.

Declaring that the rule requiring all illegal votes to be deducted from the winning side was a harsh one and that apparently we had never had occasion to consider it in relation to an annexation election, the Special Referee declined to apply it to the seven (7) illegal votes just mentioned, ruling instead that the principle of proportionate withdrawal should be applied, that is to say; that in each of the two precincts in question there should be deducted from the total number of votes in favor of annexation the same percentage of the votes found to be illegal as the votes against annexation bore to the total number of votes cast in such precinct. On this basis he ruled that only four of the seven votes now under discussion should be deducted from the total of the votes in favor of annexation. He declared that he could not apply the same rule to the fifty-seven (57) illegal votes before mentioned, for the reason that the case had been tried before him on the principle stated in the *Johnston* and *Easler cases, supra;* that the principle of proportionate withdrawal had not been argued before him; and that counsel for the defendants had conceded not only that the said fifty-seven (57) votes were illegal, but also that they should be subtracted from the number of votes in favor of annexation.

In their brief here counsel for the appellants argue for the principle of proportionate withdrawal in respect of the seven (7) illegal votes before referred to, suggesting, as did the Special Referee, that this principle appears to accord with the spirit of our election law, which provides (Code 1952, Section 23-359) that if, when a ballot box is opened, more ballots are found therein than there are names on the poll list, "all the ballots shall be returned to the box and

thoroughly mixed together and one of the managers or the clerk shall, without seeing the ballots, draw therefrom and immediately destroy as many ballots as there are in excess of the number of names on the poll list."

This contention was rejected by the circuit judge, and properly so, we think. While it has found favor in some jurisdictions (see 18 Am. Jur., Elections, Section 260), it involves in itself the element of chance, for where it is not known for which candidate or on which side of a submitted question the illegal votes were cast it cannot with certainty be said that they favored or opposed a candidate or a question in the same ratio as the total votes cast. So indeed does the rule approved in the *Johnston* and *Easler cases,* for in like circumstances it can be said with perhaps less certainty that all of the illegal votes were against the winning side. But it seems to us, apart from the matter of precedent, that the rule that has been followed by this court for more than a century and a half in cases involving election to public office, and which in our opinion is as soundly applicable in an election concerned with a question submitted to the voters, is better calculated to safeguard the purity of elections by sending the matter back to the people whenever so many illegal votes have been cast that their deduction from the winning side would affect the result, so that upon a new election it may be determined with certainty which candidate, or which side of the question, has received "the greatest number of unquestionable votes."

The quoted provision of Section 23-359 does not persuade us to a contrary view. That section purports to deal with a situation quite different from that involved in the case at bar, where certain specific votes have been challenged for illegality. And we note in passing that following the language before quoted Section 23-359 goes on to provide that "if the ballots found in the box exceed the number of names on the poll list by twenty-five votes or ten per cent of the votes cast, whichever is the lesser, the ballots shall not be counted, but a new primary or election may be ordered for the particular polling place involved."

The circuit judge properly subtracted from the number of votes in favor of annexation the fifty-seven (57) concedely illegal and the seven (7) that were held illegal by the Special Referee as before mentioned, thus reducing the margin of votes in favor of annexation from seventy (70) to six (6). He also held illegal the votes cast by nineteen (19) persons who in his opinion, contrary to that of the Special Referee, failed to meet the statutory requirement of residence within the territory proposed to be annexed.

Section 47-16, dealing with annexation elections, provides in pertinent part as follows:

"* * * Registered qualified electors residing within the corporate limits of the municipality and registered qualified electors residing within the territory proposed to be annexed to the municipality shall have the same qualifications to vote in such election as are required of registered qualified electors to vote in State and county general elections. At such election the registered qualified electors residing within the corporate limits of the municipality shall vote at the usual voting precincts thereof in boxes provided for that purpose and the registered qualified electors residing within the territory proposed to be annexed to the named municipality shall vote in a separate box or boxes to be provided for such purpose within the territory proposed to be annexed and in a precinct or precincts to be designated therein by the county commissioners of elections."

Decision of the question immediately before us must turn upon the meaning of the word "residing" as used in the Code section just quoted. That the legislature was aware of the special consequences facing those qualified electors residing within the city at the time of the election on the question of extending its limits, and of the special and different consequences facing those residing within the territory proposed to be annexed, is manifest from the requirement that the votes of each of the two groups be separately cast and separately counted. And we agree with

the circuit judge that in the light of such consequences, involving for the residents of the city the extension of all phases and functions of its government into an additional area and for the residents of the "territory" subjection to the city's jurisdiction, its taxes, zoning ordinances and licenses, and the exercise of its other regulatory powers, along with the police protection, control of sanitation, and other advantages of city living, it is reasonable to conclude that the legislature intended by the use of the word "residing" to limit the right to vote on the issue of annexation to those registered qualified electors actually residing in each of the respective areas at the time of the election, as distinguished from those who, although having their legal domicile in such area, were actually residing elsewhere.

*Easler v. Blackwell, supra,* was concerned with the election of trustees of a school district under a statute (40 Stat. at L. 1775) providing that "at such election only qualified resident electors of said district may vote." The following from the opinion in that case is applicable here:

"* * * While many definitions of the word 'resident' are to be found in the decisions, and although it is difficult to announce a wholly satisfactory definition of the term, it has always seemed to the writer of this opinion that a resident should be regarded as "one who has a residence', as distinguished from one who has a place of business, or a place where he earns his living; as 'one who abides, or dwells, or lives', in a particular place, as distinguished from one who merely 'works' in a certain locality, or in a certain place of business; and that one is a resident of that place where he makes his home, rather than of the place where he makes his living, or works when his home and his place of work are in different localities; and it is the opinion of the writer hereof that when the General Assembly limited the right to vote for trustees of Saxon School District to the 'qualified resident electors of said district', the intention was to limit such right of suffrage to those 'qualified electors' only who were 'residents' of such district; who made their

homes within such district, who had their residences there, as distinguished from their places of business, who abided there, who dwelled there, who lived there, as distinguished from those who merely worked within the district, who only earned their livelihood there. The true purpose of statutory construction is to determine the legislative intent (*State [ex rel. Crawford] v. Stevens,* 173 S. C. 149, 175 S. E. 213), and each enactment of that body is to be construed in the light of its own context (*State v. Electric Co.,* 112 S. C. 528, 100 S. E. 355). In *Clarke v. McCown, supra,* [107 S. C. 209, 92 S. E. 479], construction of the term 'qualified elector' was involved; here, we are concerned with the construction of the term 'only qualified resident electors', and it would seem that, whether wisely or not is no concern of ours, the legislative intent was to limit the right of election to those citizens who had their homes, their residences, their places of abode, their dwelling places, the places where they lived, within Saxon School District—all, as distinguished from those citizens who merely had their places of business, or places of work, within the district; for, when one maintains his home, his abode, his place of living and sleeping, in one locality, and his place of business, or work, in a different locality, it would seem that he is more nearly a 'resident' of the former than of the latter."

Of the nineteen (19) persons whose votes the circuit judge held illegal as before mentioned, nine (9) by their own testimony clearly failed to meet the test of actual residence in the area sought to be annexed. We summarize their testimony as follows, for brevity designating the area sought to be annexed as the "area":

1. Mrs. Kayle F. Turner: Once owned a home in the area; sold it five months prior to the election and, without any intention of returning to the area, moved into the city of Anderson and at the time of the election was living there pending the completion of her new home at a location seven miles distant from the city and not within the area.

2. and 3. Mr. and Mrs. Jim F. Thompson: Sold their home in the area four months prior to the election and, without any intention of returning to the area, moved into the city and at the time of the election were living there pending completion of a new home located outside of the city and not within the area.

4. E. M. Jewell: Had lived in a rented house in the area, but left it and moved into the city fifteen months prior to the election and was living there at the time of the election, with no intention of ever returning to the area. Later bought a home outside of both the city and the area, and was living there at the time of the hearing before the Special Referee.

5. Mrs. Hilda W. Vernon: Some fifteen months prior to the election sold her home in the area and moved into the city to live with her mother, her husband having entered the Air Force and having been assigned to duty overseas. Did not intend to move back, her intentiton being to go wherever her husband might be stationed after the completion of his overseas duty. At the time of the hearing was still living with her mother, but her husband had just returned home and they were about to go to Cocoa, Florida, where he will be stationed.

6. and 7. Mr. and Mrs. Jackson O'Dell. Eleven months prior to the election had vacated the apartment that they had been renting in the area and moved into the city, where they continued to reside and were residing at the time of the election and at the time of the hearing before the Special Referee. Had no intention of returning to the area. Bought a lot outside of the city and not within the area, and at the time of the hearing were planning to build a home on it.

8. and 9. Mr. and Mrs. R. L. Crawford: Mr. Crawford was manager of a motel in the area and lived there with his wife until June, 1958, sixteen months prior to the election, when he took over the operation of a

hotel in the city of Anderson, where he and Mrs. Crawford have resided ever since. Mr. Crawford at the time of the hearing before the Special Referee was operating, as lessee, the motel in the area, having a manager living there.

In our opinion the circuit judge correctly held that the nine votes just mentioned were illegal. Their rejection, coupled with that of the sixty-four (64) illegal votes hereinbefore discussed, reduced the number of votes in favor of annexation to less than one-half of the total votes cast in the area in question, and required that the election be adjudged ineffectual. We therefore need not and do not pass upon the ruling of the circuit judge that ten other votes were also illegal.

Affirmed.

TAYLOR, C. J., and MOSS, LEWIS and BUSSEY, JJ., concur.