537 S.E.2d 543

Rachel BROADHURST, Appellant/Respondent,

v.

CITY OF MYRTLE BEACH ELECTION COMMISSION, Wilson Cain, and Michael Chestnut, Respondents,

of whom Wilson Cain is Respondent/Appellant.

No. 25191.

Supreme Court of South Carolina.

Heard Aug. 2, 2000.

Decided Aug. 28, 2000.

Rehearing Denied Sept. 20, 2000.

---

**3.** This statement is admissible under Rule 801(d)(2)(A), SCRE, as an admission by a party opponent.

374

Alan D. Clemmons, of McCracken, Barnett, Richardson & Clemmons, of Myrtle Beach, and Charles L.A. Terreni, of Columbia, for appellant/respondent.

Gene McCain Connell, Jr., of Kelaher, Connell & Connor, P.A., of Surfside Beach, for respondent/appellant.

John M. Leiter, of Leiter & Snook, of Myrtle Beach, for respondent Michael Chestnut.

Michael W. Battle, of Battle & Vaught, of Conway, for respondent City of Myrtle Beach Election Commission.

BURNETT, Justice:

This is an appeal from an election protest. Respondent City of Myrtle Beach Election Commission (Election Commission) denied the protest. The circuit court reversed, granting the protest and ordering a new election on a limited basis. We affirm in part and reverse in part.

## FACTS

Appellant/Respondent Broadhurst (Broadhurst), Respondent/Appellant Cain (Cain), and Respondent Chestnut (Chestnut) were candidates in a three-way runoff election for two seats on the Myrtle Beach City Council. At the November 16, 1999, election, voters were permitted to vote for two candidates.[1] After the election, the Election Commission certified the following results: Chestnut—1720 votes; Cain—1605 votes; Broadhurst—1393 votes. The Election Commission declared Chestnut and Cain the winners.

Broadhurst filed a timely protest contesting the election. Among other claims, she alleged the failure of one of the two voting machines at the Dunes I precinct to record any votes should void the election.

At the hearing before the Election Commission, witnesses testified 413 voters signed the poll list at the Dunes I precinct.[2] One hundred and eighty-two voters voted in the machine which functioned properly. The Election Commission found 213, 217, or 231 voters voted on the machine which malfunctioned. There was no record of which voters voted on which machine. Applying a proportionate number of votes received by each candidate from the functioning machine, the Election Commission concluded it was improbable the "lost" votes, if counted, would have changed the outcome of the election. Broadhurst appealed.

Concluding 231 uncounted votes could have changed or rendered doubtful the results of the runoff election, the circuit court reversed. The circuit court determined "the appropriate remedy is to reconstruct the election in the Dunes I precinct by allowing the voters who voted in the Dunes I precinct run off election to vote again." Although it affirmed Chestnut the winner of one of the seats, the court ordered all three candidates' names to be placed on the ballot.[3] Broadhurst and Cain appealed.

---

1. *See* S.C.Code Ann. § 5–15–62 (Supp.1999).

2. Four voters voted curbside and signed a separate poll list.

3. Broadhurst had appealed other issues to the circuit court. These issues were dismissed by separate order of the circuit court and have not been appealed.

## ISSUES

I. Did the circuit court err by holding the voting machine malfunction changed or rendered doubtful the election results?

II. If the circuit court properly held the election results were rendered doubtful, did it err by ordering A) a new election between the three candidates in the Dunes I precinct open to voters who had previously voted in the runoff election and B) affirming the certification of Chestnut as winner?

## DISCUSSION

### Standard of Review

In municipal election cases, this Court reviews the judgment of the circuit court upholding or overturning the decision of a municipal election commission only to correct errors of law. The review does not extend to findings of fact unless those findings are wholly unsupported by the evidence. *George v. Municipal Election Comm'n of Charleston*, 335 S.C. 182, 516 S.E.2d 206 (1999); *Knight v. State Bd. of Canvassers*, 297 S.C. 55, 374 S.E.2d 685 (1988); *May v. Wilson*, 199 S.C. 354, 19 S.E.2d 467 (1942). The Court will employ every reasonable presumption to sustain a contested election, and will not set aside an election due to mere irregularities or illegalities unless the result is changed or rendered doubtful. *George, supra; Sims v. Ham*, 275 S.C. 369, 271 S.E.2d 316 (1980); *May, supra.*

### I.

Cain argues the circuit court erred in reversing the Election Commission. He contends the circuit court failed to apply S.C.Code Ann. § 7–13–1120 (1976) which, he argues, provides that when a voter's choice cannot be determined, the vote shall not be counted.

Agreeing with Cain, the Election Commission asserts § 7–13–1120 applies in two situations. First, it applies when the voter manually marks more names than there are persons to be elected on the ballot. Second, it applies to any errors made

in exercising a voter's choice, including mechanical errors made by a voting machine. We disagree.

Section 7-13-1120 provides:

**Disposition of improperly marked ballots.**

If a voter marks more names than there are persons to be elected or nominated to an office <u>or if for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office; but this shall not vitiate the ballot, so far as properly marked</u> . . . .

(Underline added).

■■■ All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 440 S.E.2d 364 (1994). However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention. *Id.* If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect. *Id.* The purpose of an election is to express the will of the electorate. *Redfearn v. Bd. of Canvassers of S.C.*, 234 S.C. 113, 107 S.E.2d 10 (1959).

While the language "if for any reason it is impossible to determine the voter's choice for any office to be filled" is comprehensive in scope, we find the legislature could not have intended to require election personnel to disregard votes which were intelligibly cast but cannot be read due to mechanical failure. Such an interpretation would effectively disenfranchise a voter through no fault of his own. *See Greene v. South Carolina Election Comm'n*, 314 S.C. 449, 445 S.E.2d 451 (1994) (while recognizing mandatory language of statute requiring issuance of challenge ballot to every voter who questioned voting district, Court determined legislature could not have intended this result). Instead, we conclude § 7-13-1120 applies to manual ballots where either 1) the voter selects more names than are persons to be elected or 2) because of

the nature of the voter's markings, it is unclear for whom the voter intended to vote. This interpretation is supported by the title of the statute, "Disposition of improperly marked ballots," which could not apply to ballots cast by voting machine as ballots cast by voting machine are not marked and, furthermore, cannot be *improperly* marked.[4] *Garner v. Houck*, 312 S.C. 481, 486, 435 S.E.2d 847, 849 (1993) ("[f]or interpretative purposes, the title of a statute and heading of a section are of use only when they shed light on some ambiguous word or phrase and as tools available for resolution of doubt, but they cannot undo or limit what the text makes plain."). Similarly, this interpretation is consistent with the function of an election: to declare the will of the electorate. *Redfearn*, 234 S.C. 113, 107 S.E.2d 10.

■ Cain further argues the circuit court improperly added the 231 uncounted votes to Broadhurst's total to conclude the votes could have affected the outcome of the election. He asserts 1) it is improbable Broadhurst would have received 212 of the 231 uncounted votes, 2) the precedent of adding votes to the losing candidate's total to determine if the alleged irregularity affects the outcome of the election only applies when votes have been cast illegally or fraudulently, and, 3) if the Court considers the vote count at all, the appropriate method is to subtract half of the uncounted votes from Chestnut's and Cain's total votes. We disagree.

■ In the absence of fraud, a constitutional violation, or a statute providing an irregularity or illegality invalidates an election, the Court will not set aside an election for a mere irregularity. Irregularities or illegalities which do not appear to have affected the result of the election will not be allowed to overturn it. *See In re Bamberg Ehrhardt School Bd. Election*, 337 S.C. 561, 524 S.E.2d 400 (1999); *George*, 335 S.C. 182, 516 S.E.2d 206; *Butler v. Town of Edgefield*, 328 S.C. 238, 493 S.E.2d 838 (1997); *Greene*, 314 S.C. 449, 445 S.E.2d 451; *Fielding v. South Carolina Election Comm'n*, 305 S.C. 313, 408 S.E.2d 232 (1991); *Bolt v. Cobb*, 225 S.C. 408, 82 S.E.2d 789 (1954); *Harrell v. City of Columbia*, 216 S.C. 346,

---

4. *See* 17 South Carolina Jurisprudence *Elections* § 66 (1993) ("[t]he voting machine is a mechanical method of registering votes that allows the voter to pull a tab over the name of the candidate of his choice.").

58 S.E.2d 91 (1950). In determining whether an irregularity in the conduct of an election is sufficient to render the result doubtful, "the rule deducible from the decisions is that all illegally cast ballots shall be deducted from the total number counted for the declared winning candidate, and that all rejected (uncounted), legal ballots shall be added to the total number counted for the declared losing candidate." *Easler v. Blackwell*, 195 S.C. 15, 19, 10 S.E.2d 160, 162 (1940). The Court has rejected the principle of "proportionate withdrawal" (i.e., deducting from the winner's total the same percentage of illegally cast votes as votes cast for the winner in the relative precinct). *Creamer v. City of Anderson*, 240 S.C. 118, 124 S.E.2d 788 (1962).

■ The circuit court properly added the 231 uncounted votes to Broadhurst's total in order to determine whether the uncounted votes could have affected the election. Contrary to Cain's argument, adding uncounted votes to the losing candidate's total applies when the votes have been cast legally as well as illegally. *Easler*, 195 S.C. 15, 19, 10 S.E.2d 160, 162 (". . . [a]ll rejected (uncounted), legal ballots shall be added to the total number counted for the declared losing candidate."). Moreover, even though it may be mathematically unlikely Broadhurst would have received 212 of the 231 uncounted votes,[5] the Court has determined the best method to "safeguard the purity of election" is to add the irregular votes to the losing side. *Creamer*, 240 S.C. 118, 125, 124 S.E.2d 788, 791. Subtracting half of the 231 votes from both Chestnut's and Cain's totals to determine if the uncounted votes could have affected the outcome of the election, as suggested by Cain, does not comply with this Court's longstanding method of determining whether an irregularity has affected the outcome of an election. That portion of the circuit court's order finding the failure of the voting machine to count the votes in the Dunes I precinct rendered doubtful the results of the November 16, 1999, runoff election is affirmed.

---

5. Cain asserts since Broadhurst received 31% of the votes cast in the operable voting machine in Dunes I, it is unlikely she would have received 91% of the 231 uncounted votes from the malfunctioning voting machine.

## II.

### A.

 Relying on S.C.Code Ann. § 7–13–1140 (1976), Cain asserts the circuit court applied the appropriate remedy by limiting the new election to those voters who had voted in the Dunes I precinct on November 16, 1999. Broadhurst disagrees, asserting § 5–15–130 mandates an entirely new election between all three runoff candidates open to all qualified voters in all precincts.[6]

 Under the common law, there was no right to contest an election. *Butler,* 328 S.C. 238, 493 S.E.2d 838 (1997); *Taylor v. Roche,* 271 S.C. 505, 248 S.E.2d 580 (1978). "The right to contest an election exists only under the [state] constitutional and statutory provisions, and the procedure proscribed by statute must be strictly followed." *Id.* at 509, 248 S.E.2d at 582; *see* S.C. Const. art. II, § 10 ("The General Assembly shall ... establish procedures for contested elections, and enact other provisions necessary to the fulfillment of and integrity of the election process.").

 "The elemental and cardinal rule of statutory construction is that the Court 'ascertain and effectuate actual intent of the legislature'." *Greene,* 314 S.C. 449, 445 S.E.2d 451, 453, *citing Horn v. Davis Elec. Constructors, Inc.,* 307 S.C. 559, 563, 416 S.E.2d 634, 636 (1992). In construing a statute, its words must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation. *Rowe v. Hyatt,* 321 S.C. 366, 468 S.E.2d 649 (1996). Statutes which are in derogation of common law must be strictly construed. *See Doe v. Brown,* 331 S.C. 491, 489 S.E.2d 917 (1997).

In relevant part, § 7–13–1140, cited by Cain as authorizing a second election limited to the voters who signed the Dunes I poll list, provides:

> If the number of votes cast by any type ballot or on machines in any polling place exceeds the number listed on the polling list by ten percent or more, the county executive

---

6. Neither Broadhurst nor Cain suggest the new election should be open to all registered voters in the Dunes I precinct.

committee or the county election commission, as the case may be, shall order a new primary or election at the polling place concerned if the outcome of the election could be affected. Only those who signed the poll list shall be permitted to vote in any such new primary or election.[7]

By its very language § 7–13–1140 only permits a new election at the polling place concerned and by the voters who signed the poll list when the votes cast exceed the number on the poll list by at least ten percent. It does not apply where, as here, less votes are accounted for than the number on the poll. list. *Doe, supra* (statutes in derogation of common law must be strictly construed).

■ Section 5–15–130, which applies to elections for municipal offices, provides as follows:

Within forty-eight hours after the closing of the polls, any candidate may contest the result of the election as reported by the managers by filing a written notice of such contest together with a concise statement of the grounds therefor with the Municipal Election Commission. Within forty-eight hours after the filing of such notice, the Municipal Election Commission shall, after due notice to the parties concerned, conduct a hearing on the contest, decide the issues raised, file its report together with all recorded testimony and exhibits with the clerk of court of the county in which the municipality is situated, notify the parties concerned of the decisions made, and when the decision invalidates the election the council shall order a new election as to the parties concerned.

(Underline added).

The circuit court did not have the statutory authority to order an election limited to those voters who had voted in the Dunes I precinct on November 16, 1999. In authorizing a "new election" pursuant to § 5–15–130, we conclude the General Assembly intended to provide the electorate with a second opportunity to express its will through an election once a municipal election commission invalidates the original election. We reach this conclusion for several reasons. First, § 5–15–

---

7. Section 7–13–1140 applies to municipal elections. S.C.Code Ann. ·§ 5–5–10 (municipal elections shall be conducted pursuant to Title 7 unless otherwise provided in the municipal elections statute).

130 refers to a "new" election after the original election is declared invalid. If an election is invalid, it is invalid citywide, not simply in a particular precinct. Second, the legislature chose to limit the second election only to the "parties concerned," not to the precinct(s) affected, the voters who had signed the poll list(s), or some other term qualifying the new election. *See Byrd v. Irmo High School,* 321 S.C. 426, 468 S.E.2d 861 (1996) (where a statute expressly enumerates the requirements on which it is to operate, additional requirements are not to be implied). Third, while the General Assembly could have authorized the municipal election commission to order an election limited to the precinct in which the irregularity occurred and to the voters who had previously voted as it expressly did in § 7–13–1140, it did not do so. *See Hainer v. American Med. Int'l, Inc.,* 328 S.C. 128, 492 S.E.2d 103 (1997) (if legislature had intended certain result in statute, it would have said so); *see also Roche v. Young Bros., Inc., of Florence,* 332 S.C. 75, 504 S.E.2d 311 (1998) (statutes are to be construed with reference to the whole system of law of which they form a part).[8]

Cain relies on *Buonanno v. DiStefano,* 430 A.2d 765 (R.I. 1981), as support for a remedy authorizing a new election limited to the Dunes I precinct voters who had voted in the November 16, 1999, runoff election. In *Buonanno,* two voting machines failed to accurately record the vote totals of a candidate. The Rhode Island Supreme Court affirmed the State Board of Elections' action ordering a new election in those precincts where the machines had malfunctioned. In affirming the order, the court recognized the Rhode Island legislature had not expressly authorized the election board to conduct a new election and, instead, provided the board with non-exclusive enumerated powers. Unlike the powers granted the election board in Rhode Island, municipal election boards in South Carolina are only authorized to order a new election and do not have unlimited powers. Accordingly, *Buonanno* is inapplicable.

---

**8.** *See Ayers–Schaffner v. DiStefano,* 37 F.3d 726 (1st Cir.1994) (where on citywide basis voters were incorrectly allowed to vote for two candidates for three school board seats, federal court reversed state board of election's order that new election be limited to those voters who had participated in original balloting).

### B.

 Broadhurst and Cain contend the circuit court erred by ordering Chestnut's name on the ballot while also declaring him the winner of the election.[9] Chestnut maintains the circuit court properly declared him the winner of the election and asserts his name should not be included on the ballot for the new election. He contends he is not a "party concerned" as referenced in § 5–15–130 because even with the addition of the 231 uncounted votes to Broadhurst's and Cain's totals, he would have come in second after Cain, thereby winning a seat on the Myrtle Beach City Council.[10]

As noted above, the circuit court properly determined the results of the election were rendered doubtful as a result of the malfunctioning voting machine. Since § 5–15–130 only authorizes a new election, Chestnut is clearly a "party concerned." In order to be elected to one of the two seats on the Myrtle Beach City Council, he must participate in the new election.

Even if we found § 5–15–130 authorized a "reconstructed" election limited to the voters in the Dunes I precinct who had signed the poll list on November 16, 1999, the circuit court erred in affirming the Election Commission's certification declaring Chestnut a winner. Allowing those Dunes I voters whose votes were counted to vote a second time dilutes the votes of the Myrtle Beach electors who voted in the November 16, 1999, election but who do not have the opportunity to vote again and the votes of those voters in the Dunes I precinct who participated in the original election but whose votes were not counted by the malfunctioning voting machine. Accordingly, to prevent vote dilution, it is necessary to subtract the votes tallied by the operable voting machine in the Dunes I

---

9. The Election Commission agrees with Broadhurst and Cain on this issue.

10.

| Candidate | Actual Votes Counted | Uncounted Votes | Total |
|-----------|---------------------|-----------------|-------|
| Cain | 1,605 | 231 | 1,836 |
| Chestnut | 1,720 | 0 | 1,720 |
| Broadhurst | 1,393 | 231 | 1,624 |

precinct from the candidates' total votes. Thereafter, if the 413 eligible Dunes I voters voted solely for Broadhurst and Cain in the "reconstructed" election, Chestnut would lose.[11] Accordingly, it was error for the circuit court to declare Chestnut a winner.

## CONCLUSION

It is unfortunate a voting machine failed to operate properly in the November 16, 1999, runoff election. In conducting a new election, we recognize additional expense will be incurred by the candidates, Election Commission, and, ultimately, the Myrtle Beach taxpayers. Nonetheless, in order to preserve the integrity of the election process, the General Assembly has declared the necessity of a new election. In compliance with the statutory mandate, a new election between all three candidates open to all qualified voters shall be conducted in accordance with this opinion.

**Affirmed in part, reversed in part.**

MOORE, Acting C.J., WALLER, PLEICONES, JJ., and Acting Justice JASPER M. CURETON, concur.

| Candidate | Total Votes Received | (Dunes I) Votes | Votes before 2nd Election | Votes in 2nd Election | Total |
|-----------|---------------------|-----------------|---------------------------|----------------------|-------|
| Cain | 1,605 | 114 | 1,491 | 413 | 1,904 |
| Broadhurst | 1,393 | 114 | 1,279 | 413 | 1,682 |
| Chestnut | 1,720 | 97 | 1,623 | 0 | 1,623 |