778 S.E.2d 919

**DORCHESTER COUNTY ASSESSOR, Appellant,**

v.

**MIDDLETON PLACE EQUESTRIAN CENTER, LLC, Respondent.**

Appellate Case No. 2013–002320.

No. 5358.

Court of Appeals of South Carolina.

Heard April 21, 2015.

Decided Nov. 4, 2015.

454

Andrew T. Shepherd and Kathryn H. Hyland, both of Hart Hyland Shepherd, LLC, of Summerville, for appellant.

Thomas Bacot Pritchard, of Pritchard Law Group, LLC, of Charleston, for respondent.

McDONALD, J.

The Dorchester County Assessor (the Assessor) appeals the Administrative Law Court's (ALC) order affirming the Dorchester County Board of Assessment Appeals' finding that Middleton Place Equestrian Center, LLC (Middleton Place) is entitled to retain the "agricultural use" classification for eleven parcels of land that the Assessor attempted to reclassify for the 2012 tax year. The Assessor argues the ALC erred in upholding the application of the agricultural use classification to the parcels at issue because they are dedicated solely to residential use by certain restrictive covenants. The Assessor further argues the ALC erred in concluding that an agricultural use classification still applies to the parcels at issue even if they are not timberland properties. We affirm.

**FACTS AND PROCEDURAL HISTORY**

This case involves eleven parcels of land in the Middleton Oaks Subdivision (Middleton Oaks) in Dorchester County. The parcels at issue range in size from 0.29 to 3.08 acres, and constitute a portion of a larger tract of approximately sixty-six hundred acres owned by Middleton Place.

In 1970, Charles H.P. Duell (Duell) inherited property from his grandfather that is currently part of Middleton Place,[1] as well as a significant amount of additional property, which includes the historic manor remains and gardens designated as the Middleton Place National Historic Landmark (National Historic Landmark). In conjunction with landscape architect Robert Marvin, Duell subsequently developed a master plan to sell approximately twenty-five home sites in an effort to raise the capital necessary to restore and make improvements to the National Historic Landmark. The entire tract within the master plan was classified as "agricultural use." Each time a house site was sold, the site was individually platted, and the

---

1. Duell is the Middleton Place's principal and sole member.

plat was recorded with the Dorchester County Register of Mesne Conveyances (RMC). The Assessor would then revise the classification for the purchased house site, and the site would be taxed at the then-applicable market rate.

After the creation of the master plan, Duell established the Middleton Oaks Property Owners Association, Inc., now known as the Middleton Place Property Owners Association, Inc. (MPPOA), and created a "Declaration of Covenants and Restrictions of Charles H.P. Duell as Pertain to Middleton Oaks" (Covenants and Restrictions).[2] The purpose of the Covenants and Restrictions was to create a residential community, "which is aesthetically pleasing and functionally convenient." Under the Covenants and Restrictions, Duell retains the sole and exclusive final authority for all determinations related to the covenants and restrictions although, at his discretion, Duell may appoint an architectural review board (ARB) to advise him in the process.

In 1990, the Dorchester County Planning Board contacted Duell to request that he record a plat reflecting each of the potential house sites to aid in the recording process when a house site was sold. At that time, Duell was concerned that recording such a plat might require common "subdivision" type developments, such as standard curb and gutter, sidewalk, and roadway requirements. More significantly, Duell was concerned that recording a plat reflecting the individual house sites might impact the agricultural use classification tract as a whole.

Duell brought these concerns to the attention of Joe Murray, the Dorchester County Assessor in office at the time of the County Planning Board's platting request. Duell sought and received Murray's assurance that the agricultural use classification would not be affected. Duell confirmed this understanding to Murray in an August 11, 1993 letter. From the time the plat was recorded on November 20, 1990, and until 2012, the subject property (as a whole) received the agricultural use classification for all unsold house sites.

Both prior to and after the platting change requested by Dorchester County in 1990, the house sites were sold at an

---

2. The Covenants and Restrictions were filed in Dorchester County on December 21, 1979.

average rate of less than one every two years. The last house site sale took place in 2007. Since the creation of the master plan, less than twenty house sites have been sold and fewer than a dozen homes constructed.

In 2012, approximately $40,000 worth of timber was cut from property in Middleton Place. Prior to the hearing before the ALC, the ARB had approved plans for the MPPOA to perform improvement cutting within the footprint of the parcels. Such improvement cutting is conducted periodically. Duell has cut timber from each of the eleven parcels at issue since the agriculture use designation was reaffirmed in 1993.

For the 2012 tax year, the Assessor denied Middleton Place's agricultural land use classification for the eleven non-divided parcels at issue, determining that they did not meet the statutory requirements for the agricultural land use classification. The Assessor sent assessment notices to Middleton Place informing it of the parcels' new assessed value for *ad valorem* tax purposes. Middleton Place subsequently appealed the classification denial to the Dorchester County Board of Assessment Appeals, which reversed the Assessor's determination.

On appeal to the ALC, the Assessor testified that the reason for his denial was twofold: (1) the eleven parcels at issue are all less than five acres; and (2) the Covenants and Restrictions do not allow for timber management and wholesale harvesting of timber from the contested parcels. The Assessor subsequently testified that the parcels at issue are "all—it's all timberland, yeah." The following questioning ensued on cross-examination:

Q: You said that the restrictive covenants that you relied on had somewhere in them an indication that you could not sell things for commercial purposes. And I'm asking you where in the restrictive covenants you're referencing. Is it this that you're referencing?

A: I didn't say that about Middleton. I basically made a statement that it prohibited you from doing that in the Boyle Plantation. I can't tell you exactly what it said.

Q: Okay.

A: But it basically said the same thing as Middleton that—it's—the basis for it is, it's there to protect the subdivision

itself from other influences, such as cutting timber, growing this, doing that, whatever. It's there to protect the buyers of the subdivision. If you go to buy—if you pay a huge amount of money for a lot in a subdivision, I don't think you want to wake up the next—one morning and there's a logging crew next door to you cutting all the trees off the adjacent lot. And so that's where I think any—the restrictions—the restrictive covenants prohibit you from doing that. They may say it in different ways. It all boils down, they're there to protect the homeowner. It's there to protect the subdivision as a whole from—from other influences, commercial influences.

Q: But Mr. Welch, you'll agree by your own admission, both on direct examination, just now on restatement, that your interpretation of the covenants and restrictions takes into account a whole lot of assumptions on your part.

A: Yes, but I—I read the—the assumption I make is what I read is correct; that that's what it says.

. . .

But that is why they—I said, "I assume." I use that word quite freely sometimes, but that is why—

Q. Okay.

A. —you have covenants and restrictions.

Q. Okay.

A. I don't assume that. I know that the reason you have covenants and restrictions [is] to protect the owners of the subdivision, as well as the subdivision as a whole. I say "assume" sometimes when I shouldn't, but I don't assume that. I know that. That's a fact. And that's why they're there.

The ALC found in favor of Middleton Place by order filed August 20, 2013. The ALC denied the Assessor's motion to alter or amend on September 30, 2013, and simultaneously entered an amended order reversing its award for attorney's fees to Middleton Place. The Assessor appeals, contending the ALC erred in awarding the agricultural use designation for the eleven parcels. We disagree and affirm.

## STANDARD OF REVIEW

The Administrative Procedures Act governs the standard of review from a decision of the ALC. This court may reverse or modify the decision only if:

substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–380(5) (Supp.2014).

■■■ "[T]his court may not substitute its judgment for the judgment of the ALC as to the weight of the evidence on questions of fact." *Trident Med. Ctr. v. S.C. Dep't of Health and Envtl. Control,* 412 S.C. 341, 348, 772 S.E.2d 177, 181 (Ct.App.2015). Accordingly, this court's review "is limited to determining whether the findings were supported by substantial evidence or were controlled by an error of law." *Id.* (quoting *Hill v. S.C. Dep't of Health & Envtl. Control,* 389 S.C. 1, 9, 698 S.E.2d 612, 617 (2010)). "In determining whether the AL[C]'s decision was supported by substantial evidence, this [c]ourt need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion that the AL[C] reached." *Hill,* 389 S.C. at 9–10, 698 S.E.2d at 617. "The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence." *Id.* (quoting *Jones v. S.C. Dep't of Health & Envtl. Control,* 384 S.C. 295, 304, 682 S.E.2d 282, 287 (Ct.App.2009)).

## LAW AND ANALYSIS

■■ The Assessor argues that because the Covenants and Restrictions for Middleton Oaks limit the eleven parcels to residential use, the parcels do not satisfy the statutory requirements for classification as agricultural real property for *ad valorem* tax purposes. We disagree.

"The cardinal rule of statutory construction is a court must ascertain and give effect to the intent of the legislature." *State v. Elwell*, 403 S.C. 606, 612, 743 S.E.2d 802, 806 (2013) (quoting *State v. Scott*, 351 S.C. 584, 588, 571 S.E.2d 700, 702 (2002)). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will." *Id.* (quoting *Scott*, 351 S.C. at 588, 571 S.E.2d at 702). "Therefore, [i]f a statute's language is plain, unambiguous, and conveys a clear meaning[,] the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Id.* (first alteration in original) ((quoting *Scott*, 351 S.C. at 588, 571 S.E.2d at 702)); *see also Broadhurst v. City of Myrtle Beach Election Comm'n*, 342 S.C. 373, 380, 537 S.E.2d 543, 546 (2000) ("All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute.").

South Carolina Code section 12–43–230(a) defines "agricultural real property" as

any tract of real property which is used to raise, harvest or store crops, feed, breed or manage livestock, or to produce plants, trees, fowl or animals useful to man, including the preparation of the products raised thereon for man's use and disposed of by marketing or other means. It includes but is not limited to such real property used for agriculture, grazing, horticulture, forestry, dairying and mariculture.

S.C.Code Ann. § 12–43–230(a) (2005). The statute further explains that "[i]n the event at least fifty percent of a real property tract shall qualify as 'agricultural real property', the entire tract shall be so classified, provided no other business for profit is being operated thereon." *Id.* Section 12–43–230(a) requires that the South Carolina Department of Revenue promulgate a regulation that provides a more detailed definition of "agricultural real property" for county assessors to utilize "in determining entitlement to special assessment under this article." *Id.*

South Carolina Code of Regulations provision 117–1780.1 was promulgated "to address the application of the property tax laws to agricultural property and how property may

qualify as agricultural use property." S.C.Code Ann. Regs. 117–1780(1) (2004). Pursuant to the regulation, "[r]eal property must meet the requirements for agricultural real property of Code Sections 12–43–220(d), 12–43–230, and 12–43–232 in order to be classified as agricultural real property." *Id.* Moreover, agricultural real property "shall not include any property used as the residence of the owner or others." *Id.* The following factors are considered by county assessors in determining whether the tract in question is bona fide agricultural real property:

1. The nature of the terrain

2. The density of the marketable product (timber, etc.) on the land

3. The past usage of the land

4. The economic merchantability of the agricultural product

5. The use or not of recognized care, cultivation, harvesting and like practices applicable to the product involved, and any implemented plans thereof.

6. The business or occupation of the landowner or lessee, however, the fact that the tract may have been purchased for investment purposes does not disqualify it if actually used for agricultural purposes.[3]

*Id.* In cases in which the real property is committed to more than one use—one being agricultural and the other being unrelated to agriculture—the agricultural use "must comprise the most significant use of the property in order for it to be classified as agricultural real property." Id.

Section 12–43–232(1)(a) explains that:

If the tract is used to grow timber, the tract must be five acres or more. *Tracts of timberland of less than five acres which are contiguous to or are under the same management system as a tract of timberland which meets the minimum acreage requirement are treated as part of the qualifying tract.* Tracts of timberland of less than five acres are eligible to be agricultural real property when they

---

**3.** "These factors are not, however, meant to be exclusive and all relevant facts must be considered." S.C.Code Ann. Regs. 117–1780(1) (2004).

are owned in combination with other tracts of nontimber-land agricultural real property that qualify as agricultural real property. For the purposes of this item, tracts of timberland must be devoted actively to growing trees for commercial use.

S.C.Code Ann. 12–43–232(1)(a) (2005) (emphasis added).

Here, there is no dispute that each of the eleven parcels at issue is less than five acres. The Assessor asserts there is no evidence in the record that the parcels at issue are used to "raise, harvest or store crops, feed, breed or manage livestock, or to produce plants, trees, fowl or animals useful to man, including the preparation of the products raised thereon for man's use and disposed of by marketing or other means." *See* S.C.Code Ann. § 12–43–230(a) (2005). However, Middleton Place persuasively argues the parcels at issue are "contiguous to" and "are under the same management system" as tracts of timberland exceeding the minimum acreage requirement. *See* S.C.Code Ann. § 12–43–232(1)(a) (2005).

The record reveals that Duell has been the sole and exclusive owner of the eleven parcels since inheriting them in 1970.[4] At the hearing before the ALC, Duell testified that from the time the plat was recorded in 1990, the parcels have been part of a timber management plan, which he follows throughout the whole Middleton property, both within the National Historic Landmark and otherwise. He further testified "we do have a forester full time on staff and we have a manager of the woodlands who the forester works for."

Duell explained:

[W]e don't do clear cutting with exceptions, special exception, but basically we do what we call "improvement cutting" and you have to harvest pine trees. Mr. Welch said that he had hardwoods; well, that's fine. But the bulk of our timbering has been pine trees.

Pine trees don't live, you know, more than 150 years. They start to rot. They're [lightning] rods. And at a certain point, it's just they stop growing. At a certain point, from a timber management standpoint, it's unquestionably wise to

---

4. Duell's family has owned the entire tract of approximately sixty-six hundred acres (including the eleven parcels at issue) for over three hundred years.

take them out. And we do that on all the property. We respect live oaks that can live to be hundreds of years old and we respect a lot of hardwoods that make up the conservation efforts that we do. So I also would like to point out that when Mr. Shepherd and Mr. Welch referred to the covenants talking about commercial activities on residential lots, the residential lots are where people live. The word "residential" means a residence.

And these are not residential lots. They're timber—they're part of the whole timberland until, under our system, that we—that I sell them and they become residential lots.

. . . .

We're not doing any kind of clear cutting. We have cut raised last year approximately $40,000.00 in timbering on another part of the LLC property, but the same property. Now we have plans this year to harvest timber on several sites here and the board of architectural review has already passed on that as an advisory board. As Mr. Pritchard said, I appoint when needed, ad hoc, and the advisory board already approved the timber sale for this year, which will take these mature pines and leave the land probably looking better with live oaks allowed to grow and naturalize and so on.

Despite Dorchester County's request that each parcel be separately platted in 1990, we agree with the ALC that Duell has continued to treat these parcels as a part of the entire several hundred acres, which significantly exceed the statutory minimum acreage requirement. *See* S.C.Code Ann. 12–43–232(1)(a) (2005). Moreover, he has managed the parcels in the same manner as the remainder of the property within the National Historic Landmark.

Significantly, at the hearing before the ALC, the Assessor testified the eleven parcels are "all timberland" and in his appellate brief, the Assessor argues "[t]he record contains no evidence that Middleton Place has utilized or attempted to treat the [parcels] at issue as anything other than timberland." Consequently, we are unable to find that the ALC's finding that "Respondent owns contiguous tracts of timberland which greatly exceed the minimum requirements set forth in the statute and are managed in the same manner as the subject

parcels" was arbitrary, capricious, or in any way erroneous in light of the substantial evidence in the record as a whole. *See* S.C.Code Ann. § 1–23–380(5) (Supp.2014).

**Covenants, Restrictions, and the Assessor's Assumptions**

■ In denying the eleven parcels the "agricultural use" classification, the Assessor, by his own admission, made a number of assumptions about the application of the Middleton Oaks Covenants and Restrictions to the parcels. As the ALC properly recognized, the Assessor sought to interpret the Covenants and Restrictions in the context of a traditional subdivision, failing "to apprehend and appreciate the unique nature and character of this property."

Although the Assessor testified that he read all of the Covenants and Restrictions, he admitted he interpreted two provisions in making his determination:

(1) All of the residential lots in Middleton Oaks shall be used for residential purposes exclusively.[5]

(2) No trees, bushes, or underbrush of any kind may be removed without the written approval of the [ARB].

However, as the ALC pointed out in its amended final order, the Assessor failed to give credence to clear language in the Covenants and Restrictions granting Duell the sole and exclusive power to "appoint an [ARB] to counsel him; but ultimate authority for the decisions of the [ARB] shall in all cases rest with the Owner, his heirs and assigns." Moreover, as previously noted, the Assessor testified that the parcels at issue are "all timberland" and concedes on appeal that "[t]he record contains no evidence that Middleton Place has utilized or attempted to treat the [parcels] at issue as anything other than timberland."

With respect to the Covenants and Restrictions, Duell explained:

[T]he commercial aspect of it had not to do with the business of timbering, but it had to do with people having commercial establishments in their houses. We didn't want

---

5. Under the Covenants and Restrictions, a "residential lot" is defined as "any unimproved parcel of land located within the Property which is intended for use as a site for a single family detached dwelling ... as shown upon any recorded final subdivision plat of any part of the Property."

someone to set up a shop or manufacturing or anything else in the residential lots.

The covenants, I would suggest, are not only simply to protect the owner. Owners all have different ideas of how they should be protected. But to protect the whole property in its—in its effort to attract co-stewards for Middleton Place and its effort to have people living in natural surroundings . . .

As we are unable to find any specific language indicating the Covenants and Restrictions were intended to restrict the selective cutting and appropriate timber management of the land, we must resolve all doubts "in favor of free use of the property." *Hardy v. Aiken*, 369 S.C. 160, 166, 631 S.E.2d 539, 542 (2006) (holding that a restriction on the use of property must be created in express terms or by plain and unmistakable implication, and "all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property"). Indeed, there is specific language within the Covenants and Restrictions vesting Duell with final authority for every decision as principal and sole member of Middleton Place.

### Nontimberland

■ The Assessor argues the ALC erred in concluding that pursuant to sections 12–43–232(2) and 12–43–232(3)(e), an agricultural use classification would still apply to the parcels at issue even if they were determined to be "nontimberland." We disagree.

For tracts *not* used to grow timber as provided in section 12–43–232(2),

the tract must be ten acres or more. Nontimberland tracts of less than ten acres which are contiguous to other such tracts which, when added together, meet the minimum acreage requirement, are treated as a qualifying tract. For purposes of this item (2) only, contiguous tracts include tracts with identical owners of record separated by a dedicated highway, street, or road or separated by any other public way.

S.C.Code Ann. 12–43–232(2) (2005). Under section 12–43–232(3)(e), a nontimberland tract not meeting the requirements

of section 12–43–232(2), must nevertheless be classified as agricultural real property if the current owner or an immediate family member [6] "has owned the property for at least the ten years ending January 1, 1994, and the property is classified as agricultural real property for property tax year 1994." S.C.Code Ann. § 12–43–232(3)(e) (2005). "The property must continue to be classified as agricultural real property until the property is applied to some other use or until the property is transferred to other than an immediate family member, whichever occurs first." *Id.*

Our review of the record reveals that in 1970, Duell inherited this property from his grandfather, an immediate family member. In the early–1990s, Duell obtained and recorded the plat reflecting the eleven parcels not due to any desire or intent to ever create a traditional "subdivision" development at Middleton Place, but at the request of the Dorchester County Planning Board. Thus, even if the court were to accept the Assessor's "nontimberland" argument, the Assessor's effort to reclassify the eleven parcels was erroneous because Middleton Place would be entitled to retain the "agricultural use" classification under section 12–43–232(3)(e).

**CONCLUSION**

Accordingly, the ruling of the Administrative Law Court reinstating the "agricultural use" classification for the eleven parcels is

**AFFIRMED.**

SHORT and LOCKEMY, JJ., concur.

---

**6.** "Immediate family member" is defined as "a person related to the current owner within the third degree of consanguinity or affinity and a trust all of whose noncontingent beneficiaries are related to the grantor of the trust within the third degree of consanguinity or affinity." S.C.Code Ann. § 12–43–232(3)(e) (2005).