663 S.E.2d 497

**Bruce and Barbara OLSON, Appellants,**

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Office of Ocean and Costal Resources Management, Jack L. Sims, John McCown and Molly Ball, Respondents.**

No. 4416.

Court of Appeals of South Carolina.

Heard June 3, 2008.
Decided June 20, 2008.

58

60

C. C.Harness, III, and Melinda Adelle Lucka of Mt. Pleasant; for Appellants.

Carlisle Roberts, Jr., Evander Whitehead, and Leslie S. Riley all of Columbia, Elizabeth Dieck and William A. Scott, both of Charleston, for Respondent.

HUFF, J.:

This is an appeal by Bruce and Barbara Olson from an Administrative Law Court (ALC) order finding a permit issued by the South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management (hereinafter OCRM) and subsequently transferred to the Olson's adjoining landowner, Jack L. Sims, was not a joint-use permit for Sims' lot 55 and the Olsons' lot 56. The Olsons also appeal the denial by OCRM of an independent permit for a dock from their property to the Intracoastal Waterway. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The Olsons own lot 56 in the Romain Retreat subdivision. Sims is the owner of lot 55, which is adjacent to the Olsons' property. John McCown owns lot 54, which is adjacent to Sims' lot 55. Molly Ball is the owner of lot 61, located across a drainage ditch easement from the Olsons. The Olsons' property is situated such that the extension of their property lines result in their lot bordering the drainage ditch, across from which is the backyard of the Ball property.[1] The Ball property lines extend out over a marsh and toward the Intracoastal Waterway, as do the Sims and McCown properties.[2]

The Olsons' lot was previously owned by Ann Graves, and the Sims lot was previously owned by Ann's son, Stephen Graves. In 1996, William Blume entered into two contracts to purchase lot 55 and lot 56 from Stephen Graves and Ann Graves. Prior to finalizing the purchase, Blume applied for a permit for a dock located on lot 55, noting the property was under contract to purchase. On July 3, 1997, OCRM issued a permit to Blume, but included with the permit the special condition that "this is the only dock permitted for lots 55 & 56." Prior to issuance of the permit, in April 1997, Blume informed Ann and Stephen Graves he was exercising his right to terminate the contract as he was unable to obtain a dock permit that was satisfactory to him.[3] Shortly thereafter, on July 8, 1997, Stephen Graves applied for a permit to construct a private dock from lot 55. On August 25, 1997, OCRM issued

---

1. While the Olsons asserted a portion of their property bordered a "finger of water," there is evidence of record the area around there is "hardly ever wet" and there is no cove area to the property as asserted by the Olsons.

2. Sims and Ball also testified to their ownership of lots 55A and 61A, respectively, which is marshland between their land lots 55 and 61 and the Intracoastal Waterway. McCown also testified to his ownership of the marsh between his lot 54 and the Waterway. While the Olsons contest the validity of their ownership of this marshland, we need not address the matter as it is unnecessary for our determination.

3. Stephen Graves testified that there was a dock contingency clause in the contract on his lot and Blume used a "docking pole" to the side of lot 61's dock (the Ball dock) to get out of the contract, claiming the pole interfered with his proposed dock.

the permit, which again included the special condition that it was the "only dock permitted for lots 55 and 56."

In 1998, Sims purchased lot 55 from Stephen Graves. In 2001, the Olsons purchased lot 56 from Ann Graves. In August, 2002, Stephen Graves transferred his dock permit to Sims. After discovering the Sims property was being surveyed for the construction of a dock, the Olson family approached Sims about the possibility of a joint-use dock with Sims, which Sims declined. In October 2003, Sims and McCown, who held his own permit for a private dock on his lot 54, applied for an amended permit allowing the two landowners to build one walkway down their property line leading to two pier heads. OCRM approved the amended permit for Sims and McCown in February 2004. In March 2004, the Olsons appealed the approval of the Sims/McCown amended permit for a joint-use dock and requested a contested hearing before the ALC. Thereafter, the Olsons submitted an application for their own private dock from lot 56 to the Intracoastal Waterway. On September 3, 2004, OCRM denied the Olsons' permit application. The Olsons challenged this decision by OCRM as well, and the two matters were consolidated for consideration by the ALC.

Following a hearing on the matter, the ALC judge issued his order concluding the Olsons' permit was properly denied and the Sims/McCown joint-use permit was properly issued. Specifically, the judge affirmed the denial of the Olsons' permit based on (1) the impact the proposed Olson dock would have on the adjacent property owners' value and enjoyment and (2) "the extent to which long-range, cumulative effects of the project may result within the context of other possible development and the general character of the area." He further determined, based on the evidence before him, the permit originally issued to Stephen Graves did not create a joint dock permit for lot 55 and lot 56. The ALC judge also concluded the Olsons' due process rights were not violated, and found no deprivation of the Olsons' equal protection rights as well. This appeal followed.[4]

---

4. OCRM raises the issue of jurisdiction to this court. Because the Olsons' appeal was pending before the Appellate Panel, not the ALC or the circuit court, on the effective date of Act 387 (codified at S.C.Code

## STANDARD OF REVIEW

In contested permitting cases, the ALC serves as the finder of fact. *Neal v. Brown,* 374 S.C. 641, 648, 649 S.E.2d 164, 167 (Ct.App.2007); *Brown v. S.C. Dep't of Health & Envtl. Control,* 348 S.C. 507, 520, 560 S.E.2d 410, 417 (2002). Judicial review of the ALC judge's order is governed by section 1–23–610(C) of the South Carolina Code which provides as follows:

The review of the administrative law judge's order must be confined to the record. The reviewing tribunal may affirm the decision or remand the case for further proceedings; or it may reverse or modify the decision if the substantive rights of the petitioner has (sic) been prejudiced because of (sic) the finding, conclusion, or decision is:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–610(C) (Supp.2007). Thus, this court can reverse the ALC if the findings are affected by error of law, are not supported by substantial evidence, or are characterized by abuse of discretion or clearly unwarranted exercise of discretion. The ALC's findings are supported by substantial evidence if, looking at the record as a whole, there is evidence from which reasonable minds could reach the same conclusion the administrative agency reached. *Neal,* 374 S.C. at 648, 649 S.E.2d at 167. The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence. *DuRant v. S.C. Dep't of Health & Envtl. Control,* 361 S.C. 416, 420, 604 S.E.2d 704, 707 (Ct.App.2004).

Ann. § 1–23–610 (Supp.2007)), we find jurisdiction is proper in this court pursuant to our supreme court's recent decision in *Chem–Nuclear Sys., LLC v. S.C. Board of Health & Envtl. Control,* 374 S.C. 201, 648 S.E.2d 601 (2007).

## LAW/ANALYSIS

### I. Joint Dock Permit

■ The Olsons first argue the ALC erred in finding the permit issued to Graves did not create a joint dock permit for lots 55 and 56. In particular, the Olsons point to evidence that the dock permit in question contained the provision that it was the only permit for lots 55 and 56, and that one of OCRM's internal documents on the application noted the permit type as "joint." We find substantial evidence in the record supports the ALC decision.

While the application by Stephen Graves did result in a notation on the Agency's DBASE IV information sheet that the "Permit Type" was "joint," Richard Chinnis, director of regulatory programs with OCRM, explained this language did not indicate it was an application for a joint-use permit, but designated it was a joint application with OCRM and the Corps of Engineers. We find absolutely no merit to the Olsons' assertion that Chinnis did not participate in the Blume or Graves permitting process and therefore did not "understand the dynamics of the whole process" sufficient enough to accurately describe the meaning of the condition or the notes in the file. The record clearly reflects Chinnis participated in the permitting decision for both the Blume and Graves applications. . Further, the Olsons called Chinnis as their own witness, and it was the Olsons who elicited information on the meaning of the term "joint" in the internal document from Chinnis.

As to the special condition of the permit providing "this is the only dock permitted for lots 55 and 56," we find this language insufficient to transform the permit into a joint-use permit for lots 55 and 56. Chinnis testified the condition was placed on the Blume permit because at the time Blume was in the process of acquiring both lots 55 and 56, and this was a notice to him that he need not apply for a dock permit for lot 56 as one would not be issued. Chinnis further stated he was under the assumption that Stephen Graves owned both lots 55 and 56 when he applied for the dock permit, and looking at it as they did the Blume application with one owner of both lots, the special condition was an advisement to the applicant that lot 56 was not going to receive a dock permit. Chinnis

indicated there was never any mention nor documentation of any agreement between Stephen Graves and Ann Graves for a joint-use dock.[5]   As noted above, we find no merit to the Olsons' assertion that Chinnis lacked knowledge on the subject.

Further, the evidence here clearly shows the dock permit for lot 55 issued to Stephen Graves and subsequently transferred to Sims did not include the owner of lot 56 as an applicant.   Rather, the application shows a single-use permit for a private dock was sought for lot 55, with no mention of a joint-use dock.   Additionally, the property identified on the application corresponded with the property description of lot 55 and the application clearly shows the dock was solely located within the boundaries of lot 55.   The public notice for the Graves permit application made no reference to any joint-use dock for lots 55 and 56, but indicated only it was for construction of a private dock located at lot 55.   The permit issued to Stephen Graves by OCRM stated the purpose of the permit was "for the property owner's private recreational use."   Accordingly, substantial evidence exists to support the ALC judge's decision that no joint-use dock permit existed for lot 55 and 56.

Additionally, as noted by the ALC judge, there is no evidence the Olsons have secured any easement rights to cross Sims' property to reach the dock located on lot 55.   In fact, the Olsons admitted they had no written agreement for a joint-use dock with Sims, nor an easement across Sims' property.   Issuance of a joint-use permit for lots 55 and 56 by OCRM could not convey any right for the owners of lot 56 to cross the land of lot 55.   *See* 23A S.C.Code Ann. Regs. § 30–4(E) (Supp.2007) ("No permit shall convey, nor be interpreted to convey, a property right in the land or water in which the permitted activity is located.").   Thus, the Olsons would have no access to the dock as originally permitted from the Graves application.   This lack of access further indicates the Graves permit was not a joint-use permit for lots 55 and 56.

---

**5.**   Stephen Graves testified he was involved with the sale of lot 56 to the Olsons and that he never told the Olsons they had a joint-use dock with Sims. He specifically informed the Olsons that lot 56 did not have a dock permit and informed Mr. Olson "a number of times" that he did not have a right to a dock for that property.

## II.   Independent Dock Permit

█  The Olsons next maintain lot 56 is entitled to its own dock and their application should have resulted in the issuance of a permit.  We disagree.

In asserting their right to an independent dock permit, the Olsons challenge several of the bases cited by OCRM in its letter denying the Olsons permit request.  However, this court is concerned with whether the ALC judge's decision was supported by substantial evidence.  While the ALC judge agreed with the Olsons that several of OCRM's reasons were insufficient as a basis for denial, he concluded that there were two separate bases which warranted denial of the permit.  We find substantial evidence in the record to support the ALC judge's decision.

In determining whether to approve or deny a permit application the Department is to base its decision on the individual merits of each application, the policies specified in South Carolina Code sections 48–39–20 and 48–39–30, and specified statutory general considerations, including "[t]he extent to which the proposed use could affect the value and enjoyment of adjacent owners."  S.C.Code Ann. § 48–39–150(A)(10) (2008).  "After considering the views of interested agencies, local governments and persons, and after evaluation of biological and economic considerations, *if the department finds that the application is not contrary to the policies specified in this chapter*, it shall issue to the applicant a permit."  S.C.Code Ann. § 48–39–150(B) (2008) (emphasis added).  South Carolina Code of Regulations section 30–11(B) includes the same general considerations as South Carolina Code Annotated section 48–39–150, with section 30–11(B)(10) of the Regulations likewise providing the Department must consider "[t]he extent to which the proposed use could affect the value and enjoyment of adjacent owners."  23A S.C.Code Ann. Regs. § 30–11(B)(10) (Supp.2007).  The Regulations further provide that in fulfilling its responsibility under section 48–39–150, the Department must also be guided in part by "[t]he extent to which long-range, cumulative effects of the project may result within the context of other possible development and the general character of the area."  23A S.C.Code Ann. Regs. § 30–11(C)(1) (Supp.2007).  The ALC judge determined both

the impact on adjacent owners and the long-range cumulative effects of the project warranted denial of the permit.

In the present case, there is evidence that the dock as proposed by the Olsons would have to come through some trees and run down the drainage ditch easement border between the Olson and Ball property lines, and that there was no cove or other such area as depicted in the Olsons' permit application.[6] The dock would then have to "bend" at a right angle to head out toward the water. Additionally, the Olsons' proposed dock and pier would be in very close proximity to existing docks and piers. Specifically, the proposed Olson dock would have to run between the Ball dock and Sims/ McCown dock and would be as close as seven feet from the Ball dock and forty-four feet from the Sims floating dock. Further, there is an existing piling[7] that is used for mooring and as an area for swimming between the Ball and Sims floating docks, and that piling would have to be removed for construction of the dock as proposed by the Olsons. McCown testified to safety issues with swimming off the docks that would be created by the proposed new dock. Sims also testified to safety concerns with boat navigation if another dock were allowed in that area. Sims maintained an attempt to place another dock between the two existing docks would also lower his property value because of the close proximity. Ball likewise testified to the decreased value of her property from the proposed Olson dock, stating it would "clog up the whole view," make it impossible to navigate, impair their ability to swim, kayak and fish from their dock, and impede the ability to tie boats up to the side of her dock. Accordingly, there is substantial evidence to support the ALC judge's finding concerning the effect on the adjacent owners' value and enjoyment.

There is also evidence of record that the proposed Olson dock would have long-range, cumulative effects within the

---

6. Stephen Graves testified the Olsons' lot "does touch salt marsh on the corner" but it then "becomes the ditch that runs down the property line and all the way through the main drainage trunk."

7. This piling appears to be the same "docking pole" Stephen Graves referred to that Blume used as a reason to get out of his contract to purchase lot 55.

context of other possible development and the general character of the area. McCown testified allowing the Olsons to build a dock there would open it up to others being able to build a dock down any ditch that runs to the Intracoastal Waterway. Sims expressed concern that building a dock in that location could block the easement and jeopardize maintenance of the ditch. Richard Chinnis testified placement of a dock down the drainage easement could inhibit the maintenance of the area. He further stated that a permit for the proposed Olson dock would violate the definition of waterfront property in the Regulations and, assuming adequate room existed to build the dock as proposed, the cumulative impact of permitting docks on non-waterfront property would cause material harm to the policies of the Act governing the permitting process. Thus, there is substantial evidence.

### III. Due Process

The Olsons next assert they were not afforded procedural due process. Specifically, they maintain they were entitled to direct notice of the Sims/McCown dock permit amendment and were not afforded the same.

When Sims and McCown applied to amend their permits to build a joint-use dock, no direct notice was sent to the Olsons as adjoining property owners. However, public notice for the request was published in the Post and Courier on January 10, 2004. The amended permit actually reduced the overall square footage of the two pier heads, and changed the number of walkways from two to only one. Richard Chinnis testified no public notice was required for an amended permit if the size of the project was smaller and there was no change in use. However, he later acknowledged, generally speaking, if it involves combining two permits, "it should go on public notice." It was never clarified whether the newspaper notice sufficed as "public notice."

Assuming arguendo the Olsons were entitled to direct notice of the amended application, we find no violation of the Olsons' due process rights. "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amend-

ment of the United States Constitution." *Kurschner v. City of Camden Planning Comm'n,* 376 S.C. 165, 171, 656 S.E.2d 346, 350 (2008). "Due process requires (1) adequate notice; (2) adequate opportunity for a hearing; (3) the right to introduce evidence; and (4) the right to confront and cross-examine witnesses." *Clear Channel Outdoor v. City of Myrtle Beach,* 372 S.C. 230, 235, 642 S.E.2d 565, 567 (2007). Procedural due process requirements are not technical, and no particular form of procedure is necessary. *Sloan v. S.C. Bd. Of Physical Therapy Exam'rs,* 370 S.C. 452, 485, 636 S.E.2d 598, 615 (2006). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. Id. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *S.C. Dep't. of Soc. Servs. v. Beeks,* 325 S.C. 243, 246, 481 S.E.2d 703, 705 (1997). To prevail on a claim of denial of due process, there must be a showing of substantial prejudice. *Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 435, 319 S.E.2d 695, 698 (1984).

The amended permit for the Sims/McCown joint-use dock was issued in February 2004 and the Olson's appealed the approval of the amendment the following month. A full hearing was held on the matter before the ALC, where the Olsons challenged the joint-use dock permit approved for Sims and McCown. As noted by the ALC judge, the Olsons participated extensively in the hearing by eliciting testimony, presenting evidence, and confronting witnesses. Thus, the Olsons received an opportunity to be heard at a meaningful time and in a meaningful manner. Furthermore, no prejudice resulted because the Olsons received sufficient notice of the actions of OCRM such that they were able to obtain a hearing before the ALC providing them the opportunities required by due process. We also agree with the ALC judge the fact that Sims and McCown continued construction of the joint-use dock did not violate the Olsons' due process rights since, had the Olsons been successful in contesting the matter, the ALC could have ordered the removal of the dock. Accordingly, we find no denial of the Olsons' due process rights.

## IV. Equal Protection

Finally, the Olsons maintain they were deprived of their right to equal protection because Sims' lot 55 is "identi-

cally situated" to their lot 56, and the denial of the right to a dock to them is therefore "patently unequal treatment." We disagree.

Under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, "a state may not 'deny to any person within its jurisdiction the equal protection of the laws.'" *Town of Iva ex rel. Zoning Adm'r v. Holley*, 374 S.C. 537, 540–41, 649 S.E.2d 108, 110 (Ct.App. 2007) (citing U.S. Const. amend. XIV, § 1). "The *sine qua non* of an equal protection claim is a showing that similarly situated persons received disparate treatment." *Grant v. S.C. Coastal Council*, 319 S.C. 348, 354, 461 S.E.2d 388, 391 (1995). The Olsons claim similarity between lots 55 and 56, summarily arguing they "have angled lines in the highwater, both would fail to reach water before either extended property line reached other land, and both got an interest in the Graves permit." The Olsons fail, however, to cite any evidence of record that support these assertions. Further, as previously determined, the Olsons' lot has no interest in the dock permit originally issued to Graves and transferred to Sims.

At any rate, a review of the record reveals substantial differences in the two properties. First, the shape and location of the Olsons' lot requires the dock's walkway to be placed along a drainage ditch. The Sims/McCown dock does not run along the drainage ditch, but runs down their common property line. Additionally, an aerial photograph showing the existing Ball and Sims/McCown docks submitted into evidence, and used to demonstrate the position of the proposed Olson dock, reflects that the Sims/McCown dock runs straight out over the marsh and into the Intracoastal Waterway, while the Olson dock would have to make a dogleg bend at a right angle to head out toward the water. Chinnis testified that OCRM "generally [does not] let people build sharply angled like that off a non-waterfront property." Accordingly, the Olsons failed to meet their burden of demonstrating they were treated differently from other similarly situated landowners and we find no equal protection violation.

Based on the foregoing, the decision of the ALC is

**AFFIRMED.**

ANDERSON and KITTREDGE, JJ., concur.