682 S.E.2d 282

**Evan and Leslie JONES, Appellants**

**v.**

**SC DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and Arthur Moore, Respondents.**

**No. 4583.**

Court of Appeals of South Carolina.

Submitted June 1, 2009.

Decided July 7, 2009.

Rehearing Denied Aug. 25, 2009.

298

299

Cotton C. Harness, III, and Melinda A. Lucka, both of Mt. Pleasant, for Appellants.

Christopher Holmes, of Mt. Pleasant and Elizabeth Applegate Dieck, of Charleston, for Respondents.

HUFF, J.:

This case involves an appeal from the granting of an amended dock permit to respondent Arthur Moore by the South Carolina Department of Health and Environmental Control (DHEC), Bureau of Ocean and Coastal Resource Management (OCRM). The Administrative Law Court (ALC) affirmed the issuance of the permit. This decision was affirmed by the Coastal Zone Management Appellate Panel, which was thereafter affirmed by the circuit court. On appeal, appellants Evan and Leslie Jones assert the granting of the dock amendment violates various code regulations. They further take issue with procedural aspects of the case, contending an initial

letter denying the amendment was a final decision and that their due process rights were violated. We affirm.[1]

## FACTUAL/PROCEDURAL HISTORY

On December 20, 1999, OCRM approved a dock master plan (DMP) for the Rivertowne Subdivision (Rivertowne) in Mount Pleasant, South Carolina. The DMP included proposed dock corridors for various properties within the subdivision. In August 2001, Moore and his wife purchased lot 39, and on July 8, 2004, the Joneses purchased lot 38 in Rivertowne. The DMP established the Joneses' dock corridor extended directly to the Wando River (Wando), while the Moore's dock corridor extended to a tributary of the Wando. The Joneses' lot is in two sections, consisting of a pie shaped landward portion connected by a bridge to an island, which has a dock on the Wando. Moore's lot is similarly shaped to the Jones's landward lot, and its property lines extend out partially over the Wando River and partially over marsh and a creek that runs off of the Wando. Thus, Moore has waterfront property to the Wando to a point.

In 2002, Moore applied for and received a dock permit within the boundaries of the original dock corridor approved in the DMP, allowing the construction of a dock to the creek running off the Wando. However, after receiving the permit, Moore began to explore the area and discovered it was difficult to get his boat to the permitted area unless it was very close to high tide. He experienced problems maneuvering his boat in the mouth of the creek and even ran aground on high tide because of a large shell bank. Realizing the difficulty of navigating around the shell bank and that there was minimal access available to this area on a day to day basis, in July 2004 Moore applied for an amendment to his dock permit, with a new proposed dock corridor extending to the Wando.

In August 2004, the Joneses notified OCRM they strongly opposed the proposed amendment submitted by Moore, noting they believed the modification would create a significant negative impact on their ability to navigate in the adjacent creek,

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

would permanently block their access to the tidal creek, and would restrict their use of the waterway. Thereafter, the Joneses received a copy of a denial letter dated September 28, 2004, as well as a September 29, 2004 memorandum notice to all interested parties that Moore's amendment request had been denied. However, on November 23, 2004, DHEC's Office of General Counsel sent Moore's attorney a letter indicating OCRM's manager of critical area permitting, Curtis Joyner, intended to issue the permit requested. The letter noted that before Joyner was able to take any action in that regard, notice of a denial letter was mistakenly mailed to the adjacent property owners. It further stated the denial letter was only a draft, not intended to be the agency's final decision, and it was determined the agency could revoke the prior letter and reissue notice of the decision allowing the amended permit. On December 22, 2004, the Joneses received a letter from OCRM indicating Moore's amended permit authorizing a new dock alignment had been approved.

The Joneses appealed OCRM's decision to the ALC, which affirmed the grant of Moore's amended dock permit realigning his walkway to provide access to the Wando River, but imposed two additional conditions on the permit.[2] The Joneses thereafter appealed to the Coastal Zone Management Appellate Panel, which found substantial evidence of record to support the ALC and affirmed the decision. The Joneses again appealed, and the decision to grant Moore's amended permit was thereafter affirmed by the circuit court. This appeal followed.

## ISSUES

1. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–12(A)(2)(n) was not violated.

---

**2.** These conditions included (1) that the walkway to the dock be elevated to five feet above mean high water at the point where it intersects with the area of marsh leading from the Joneses' bridge to the tributary and (2) the location of the pier, as shown by staking in the field prior to construction, may not be closer than twenty feet to the mouth of the tributary, and if the floating dock was closer than twenty feet to the mouth of the tributary, the floating dock would be relocated to the upstream side of the pier or in front of the pier.

2. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–12(A)(2)(c) was not violated.

3. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–12(A)(2)(d) was not violated.

4. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–12(A)(2)(e) was not violated.

5. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–12(A)(2)(h) was not violated.

6. Whether the trial judge erred in finding 23A S.C.Code Ann. Regs. 30–11(B)(10) was not violated.

7. Whether the trial judge erred in ruling the Joneses' due process rights were not violated.

8. Whether the trial judge erred in finding the Dock Master Plan was not violated.

9. Whether the trial judge erred in ruling the September 28, 2004 denial could be revoked.

10. Whether the reviewing circuit court judge erred in affirming the ALC.

## STANDARD OF REVIEW

In a contested permitting case, the ALC presides as the fact finder. *Brown v. S.C. Dep't of Health & Envtl. Control*, 348 S.C. 507, 520, 560 S.E.2d 410, 417 (2002). In reviewing the final decision of the ALJ, the Coastal Zone Management Appellate Panel sat as a quasi-judicial tribunal and was not entitled to make findings of fact. *Dorman v. S.C. Dep't of Health & Envtl. Control*, 350 S.C. 159, 164, 565 S.E.2d 119, 122 (Ct.App.2002). The Coastal Zone Management Appellate Panel could only reverse the ALC based on an error of law or if its findings were not supported by substantial evidence. *Id.* at 165, 565 S.E.2d at 122. The circuit court's review, as well as this court's, was governed by the prior version of section 1–23–380(A)(6) of the South Carolina Code, which provided the court could reverse a decision of an administrative agency if the agency's findings or conclusions were:

 (a) in violation of constitutional or statutory provisions;

 (b) in excess of the statutory authority of the agency;

 (c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–380(A)(6) (2005).

In determining whether the ALC's decision was supported by substantial evidence, this court need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion that the ALC reached. *DuRant v. S.C. Dep't of Health & Envtl.* Control, 361 S.C. 416, 420, 604 S.E.2d 704, 706 (Ct.App.2004). "The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence." *Id.* at 420, 604 S.E.2d at 707.

## LAW/ANALYSIS

### I. Violation of Reg. 30–12(A)(2)(n)

The Joneses first argue the ALC erred in failing to find Regulation 30–12(A)(2)(n) was violated by the amended permit. They argue, when considering the definition of navigability as defined in the regulations, the case law, and the testimony submitted, the "horseshoe" creek and the creek that connects the unnamed tributary to the area of their bridge are navigable and cannot be bridged. They further assert the regulations require the Moore dock to extend to the first creek that is the shortest distance from the Moore property. Accordingly, they contend this regulation precludes issuance of the amended permit.

Looking at the regulation in effect at the time of application and issuance of the amended permit in this matter, Regulation 30–12(A)(2)(n) provided in pertinent part as follows:

Docks must generally extend to the first navigable creek, within extensions of upland property lines or corridor lines, that has a defined channel as evidenced by a significant change of grade with the surrounding marsh; or having an established history of navigational access or use. A creek with an established history of navigational use may also be

considered as navigable. Such creeks cannot be bridged in order to obtain access to deeper water. . . . In exceptional cases, the Department may allow an open water channel to be bridged if current access is limited by other man made or natural restrictions or if site-specific conditions warrant such a crossing.

23A S.C.Code Ann. Regs. 30–12(A)(2)(n) (Supp.2004).

 In determining whether a waterway is navigable, " '[t]he true test to be applied is whether a stream inherently and by its nature has the capacity for valuable floatage, irrespective of the fact of actual use or the extent of such use.' " *Hughes v. Nelson*, 303 S.C. 102, 105, 399 S.E.2d 24, 25 (Ct.App.1990) (quoting *State ex rel. Medlock v. South Carolina Coastal Council*, 289 S.C. 445, 449, 346 S.E.2d 716, 719 (1986)). The test of navigability is not whether a waterway is accessible at all times, but whether it is accessible at the ordinary stage of the water. *Id.* at 106, 399 S.E.2d at 26.

At the hearing before the ALC, the Joneses presented testimony on their use of the smaller tributaries near the bridge connecting their highland property to their island from which their dock extended into the Wando River. In particular, they testified regarding their use of a "horseshoe" shaped tributary off the main creek from the river that they traversed to get from their highland property near the bridge out to the larger tributary or out to the Wando. Jones testified to numerous times he had navigated in the smaller tributaries in his kayak and canoe. He stated he generally launched his canoe or kayak from the landward portion of his lot by the bridge to enter the tributaries, and would explore the wildlife in the area. He did not launch his canoe from his dock in the Wando because the river was too rough, and he could only do so on certain days if the water was agreeable. Additionally, Jones' son, Justin, testified he had used his smaller, twenty-foot motorized boat to retrieve and transport items from the landward portion of the property to the dock, navigating all the way up to the bridge on the highland. Justin stated he generally waited for the water to "come up nice and high" before he would make such a trip, that he would generally go at high tide, and while he could not make it at low tide, it was possible to do around mid tide, depending on the tide change. In describing his navigation of his motorized boat at mid tide,

Justin stated he could make the trip if it was a "good mid tide." Jones testified that if a dock walkway was constructed as proposed, there was no way it could avoid crossing over the horseshoe, and it would block his ability to traverse the horseshoe and get out to the Wando. Both Jones and his son believed that a dock positioned in the amended dock corridor could only avoid the horseshoe tributary if it crossed over into the Joneses' extended property lines.

Curtis Joyner testified that he was OCRM's manager of critical area permitting and the ultimate decision of whether to issue a critical area permit rested with him. Joyner viewed the area in question at the time the agency was considering the DMP for Rivertowne, and he did not notice anything in the general vicinity that would constitute a navigable creek. In preparation for the hearing in this matter, Joyner made another site visit to the area the day before the hearing, his main focus being to view the tributaries. Joyner found the tributary next to the bridge was only about a foot wide and hardly evidenced any change in grade, if any at all. Joyner described this area as a "mud flat" and "flat as a pancake." He concluded this area did not qualify as a navigable creek. He further testified he viewed the horseshoe tributary from a distance. Joyner described this tributary as "very small," and stated that it did not possess much width, and did not "really elevate itself." He did not believe the horseshoe tributary exhibited a significant change in grade. Joyner concluded the horseshoe tributary was not a navigable tributary either. Additionally, Joyner testified it was feasible for the proposed dock to reach the Wando without crossing the horseshoe. And further, while he did not believe the proposed dock would have to cross extended property lines, doing so would be permissible under the regulations as long as there was no material harm to the policies of the regulations. Finally, Joyner testified he was "pretty certain" the proposed walkway would not cross over any portion of the horseshoe, but assuming he was incorrect about the horseshoe tributary and it did exhibit a significant change of grade and the walkway infringed on the tributary, Moore would be required to move his walkway over some to avoid the horseshoe.

Respondent Moore testified that he walked the entire line of the marsh from his high ground property through the marsh

out to the Wando. He stated he could construct a walkway to a pier from his high ground to the Wando that would cross neither the Joneses' extended property line nor the horseshoe tributary. Moore further testified he was amenable to elevating any portion of his walkway to accommodate Jones so he would have the ability to use his canoe in the area.

As to navigability, the ALC found the small tributaries branching from the main tributary and leading to the Joneses' bridge had little if any water in them at low tide, and concurred with OCRM's observations that the area next to the bridge was a mud flat and would not be considered navigable at mid tide or below by any craft other than boats requiring a minimal depth of water such as kayaks or canoes. The ALC similarly found the horseshoe was not navigable to any water craft other than kayaks and canoes and the tributaries near the bridge and in the horseshoe have no defined channels as evidenced by a significant change in grade with the surrounding marsh. The ALC noted Jones navigated the tributaries while paddling in craft which required no more than a few inches of water, and that Justin's navigation of the area occurred around high tide, or what Justin described as "a good mid tide." When weighing the testimony of Jones and his son based on their personal observations against the OCRM staff's observations and experience in applying Regulation 30–12(A)(2)(n), the ALC found the Joneses' evidence was not persuasive. The ALC determined the evidence did not demonstrate an established history of navigational use, as the use of a canoe or kayak in the area for a period of a few months did not constitute an established history of navigational use. The ALC also found Justin's limited use of the tributaries did not demonstrate an established history of navigational access or use. Accordingly, it concluded the proposed dock could be constructed to the Wando without violating this regulation's prohibition of bridging navigable creeks.

We find there is substantial evidence to support the finding of the ALC in this regard. The OCRM critical permitting manager specifically testified, based on his observations of the area, that neither the area next to the Joneses' bridge nor the horseshoe area exhibited a significant change in grade. Joyner concluded neither were navigable tributaries. He further testified it was feasible for Moore's proposed dock to reach the

Wando without crossing the horseshoe area, and while he did not believe the proposed dock would have to cross extended property lines, doing so would be permissible under the regulations as long as there was no material harm to the policies of the regulations. Additionally, if it was determined the horseshoe tributary did in fact have a significant change of grade so as to be considered navigable and the walkway did infringe on the tributary, Moore would be required to move his walkway over in order to avoid the horseshoe. We further find substantial evidence to support the ALC's finding that Jones' use of a kayak or canoe for a limited period of only a few months and Justin's limited use of the tributaries in question during high tide or a "good mid tide" did not demonstrate an *established history* of navigational access or use.

In regard to the regulation's requirement that the dock extend to the first navigable creek, the record reveals the amended dock permit would allow a 632 foot walkway with a dock accessing the Wando, while the original permit was for a 350 foot walkway with a dock on the main creek which runs off the Wando. The dock to the creek would clearly be a shorter distance than the dock permitted to the Wando. The ALC determined, however, that regulation 30–12(A)(2)(n) does not require that docks be built to the *closest* navigable creek. Rather, the court found the most reasonable interpretation of this regulation is that the dock must be placed in the first navigable waterway it reaches within the alignment of the dock, as long as the alignment complies with other regulatory provisions. We agree.

Regulation 30–12(A)(2)(n) does not simply state a dock must extend to the first navigable creek, but further provides it must extend to such a creek "within extensions of upland property lines or corridor lines." 23A S.C.Code Ann. Regs. 30–12(A)(2)(n) (Supp.2004). Further, Joyner stated that his experience was that this particular portion of the regulation "speaks [only] to crossing a tributary to get to a larger body" of water. He testified that the interpretation that it required one to take the "closer shot" had been rejected, and it is only when one must cross a navigable creek to get to deep water that the dock must stop at the first channel.

The words of a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. *Buist v. Huggins*, 367 S.C. 268, 276, 625 S.E.2d 636, 640 (2006). The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. *Id.* Further, "[t]he construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." *Id.*

The regulation in question provides a dock must extend to the first navigable creek within extensions of upland property lines or corridor lines, not that it must extend to the closest navigable creek. Thus, under the plain and ordinary meaning of this regulation, as long as the dock extends to the first navigable creek within the permitted alignment, it will not run afoul of the regulation. Further, Joyner's testimony reflects the agency has construed this regulation to require that a dock not be allowed to cross a navigable creek within a dock alignment and rejected that a dock must be placed at the closest navigable creek to the property. We find no compelling reason to overrule this construction by the agency.

## II. Violation of Reg. 30–12(A)(2)(c)

The Joneses argue "the dock size and extension does not comply with Regulation 30–12(A)(2)(c)." This section, effective at the time of this case, provided: "The size and extension of a dock or pier must be limited to that which is reasonable for the intended use." 23A S.C.Code Ann. Regs. 30–12(A)(2)(c) (Supp.2004).

Under the original permit, the dock was allowed to be 120 square feet. Under the amended permit, the dock can be 600 square feet. The Joneses argue the original permit was sufficient for the intended use and that Moore's property is not in fact riverfront property. They contend this fact is evidenced by the substantial price difference between the Moore lot and their own. Although Moore may have paid considerably less for his lot, there is substantial evidence in the record that Moore's property lines extend out partially over the Wando River. According to Mary Theresa Rogers

with OCRM, there is no question that Moore has waterfront property to a point to the Wando River. As the ALC found, there is no evidence that the proposed dock's size is unreasonable for the Wando River. Accordingly we find substantial evidence supports the ALC's finding that the proposed dock does not violate Regulation 30–12(A)(2)(c).

### III. Violation of Reg. 30–12(A)(2)(d)

 The Joneses next contend the proposed dock is in violation of Regulation 30–12(A)(2)(d) which, at the pertinent time, provided "[d]ocks and piers should use the least environmentally damaging alignment." 23A S.C.Code Ann. Regs. 30–12(A)(2)(d) (Supp.2004). Although they acknowledge that a longer walkway is not necessarily more environmentally damaging, they summarily assert "that the position that uses available access to the creek while preserving the navigation for the public is less impactful to the environment." The Joneses cite no case law nor point to any testimony in the record to support this position. Indeed, the record establishes that OCRM has become concerned with the impact of docks on small tidal creeks because of the boating activity attendant to such docks, resulting in "disturbing activity" to the highly productive fishery habitats. Thus, the impact of a dock on a smaller tributary is greater than that on a larger body of water such as the Wando. Accordingly, this portion of the regulations is not limited to the length of the walkway but can include consideration of the impact on a small tributary versus a larger body of water. OCRM therefore has been trying to "get out of the business of issuing [permits for] docks in very small creeks." Based on the foregoing, we find substantial evidence exists to support the ALC's finding that, at a minimum, the amended dock follows an alignment that is no more environmentally damaging than the original alignment, and "since a dock in the Wando River will not create the adverse impact on aquatic life as would the smaller dock in the tributary, it will have less of a detrimental impact upon the environment."

### IV. Violation of Reg. 30–12(A)(2)(e)

 The Joneses also assert a violation of Regulation 30–12(A)(2)(e), which provided as follows:

All applications for docks and piers should accurately illustrate the alignment of property boundaries with adjacent owners and show the distance of the proposed dock from such extended property boundaries. For the purpose of this section, the extension of these boundaries will be an extension of the high ground property line. The Department may consider an alternative alignment if site specific characteristics warrant or in the case of dock master plans, when appropriate.

23A S.C.Code Ann. Regs. 30–12(A)(2)(e) (Supp.2004). Specifically, they argue the dock application failed to accurately demonstrate the location of the dock in relation to navigable creeks or their property lines, and without information as to the distance of the pierhead from the mouth of the tributary, the distance of the proposed dock from their dock, and the location of the walkway, it was impossible to determine exactly where the proposed structure would be located.

In his application for the amended permit, Moore provided documents including a survey reflecting both the existing dock corridor as well as the proposed new dock corridor. The proposed dock corridor was fifty feet in width and showed an additional twenty foot buffer between the fifty foot wide corridor and the Joneses' extended property line. It reflected a four foot by 632 foot walkway connected to a twenty foot by twenty foot covered pierhead, with a ten by twenty foot floating dock attached to the pierhead by means of a four by twenty foot gangway. Curtis Joyner testified he could look at the submitted documents and determine the location of the pierhead as "right up the middle" of the corridor. When asked if he knew where the corridor would actually be on the ground he stated, "there are coverable bearings and distances on [the documents]" and he thought they "could certainly put it in that field." When asked if he could "say with a degree of certainty ... exactly where the walkway is going to go, or where the pierhead is going to be located," Joyner replied, "yes." Joyner further testified that the survey submitted with the amendment request reflected a measurement of twenty feet between the dock corridor and the edge of the Joneses' island, and in looking at the survey, he could determine the location of the corridor on an aerial photograph of the area that was admitted into evidence. Finally, when asked why

OCRM had not required a plat showing the exact location of the pierhead and walkway, Joyner stated they "felt pretty comfortable with what [they] had in the application." Additionally, Moore testified concerning various measurements and the proposed alignment from his property to the Wando. He determined his pierhead would be about twenty feet from the mouth of the tributary.

A review of the submitted survey documents, along with the testimony of Joyner and Moore, convinces us the application was sufficient to accurately illustrate the alignment of Moore's property boundaries with that of the Joneses' and show the distance of Moore's proposed dock from the extended property boundaries. Further, there is evidence of the distance of the proposed pierhead from the mouth of the tributary in question and the location of the walkway. Additionally, it does not appear the Joneses raised any issue concerning the proximity of the proposed Moore dock to the Joneses' existing dock, and a review of the record before us does not indicate any problems associated with the proximity of the two docks. Also, as noted by the ALC, one of the conditions of the permit is that Moore stake the location in the field and have the location of the walkway and pier approved by OCRM prior to construction. Thus, this requirement will insure the pier and floating dock are located in accordance with the amended permit and in keeping with OCRM's regulations. Finally, one of the additional conditions placed on the amended permit by the ALC is that the location of the pier, as shown by staking in the field prior to construction, may not be closer than twenty feet to the mouth of the tributary, and if the floating dock is closer than twenty feet to the mouth of the tributary, the floating dock would have to be relocated to the upstream side of the pier or in front of the pier.

## V. Violation of Reg. 30–12(A)(2)(h)

The Joneses argue the ALC erred in holding the dock alignment did not violate Regulation 30–12(A)(2)(h). This regulation provided in part:

> Developers of subdivisions and multiple family dwellings are encouraged to develop plans which include joint-use docks and/or community docks at the time of required dock master plans. Dock corridors on the approved Dock Master

Plan must be shown with bearings or State Plane Coordinates on a recordable subdivision plat for the development, and recorded in the appropriate County Office of Deeds. Subsequent re-surveys or modifications to lots shall reference the dock corridors on the recorded subdivision plat. Reference to this DMP must be given in all contracts for lot sales. . . .

23A S.C.Code Ann. Regs. 30–12–(A)(2)(h) (Supp.2004).

We fail to see how the permit amendment violates this regulation, which pertains to the creation and distribution of a DMP.

 The Joneses additionally argue Moore should not be allowed to build a dock outside of the corridor that was set in the original DMP. Although the Joneses acknowledge the DMP has in fact been amended several times, they assert amendment is not warranted in this case.

A DMP is not set in stone and beyond amendment. In his letter approving the original DMP, Curtis Joyner cautioned that the plan was conceptual and was advisory only. The letter, which apparently follows the language of the Coastal Zone Management Plan Document, provided: "This master plan shall be presumed to take precedence over applications inconsistent with this plan unless new information is revealed in an application to address and overcome the concerns identified [in the dock master plan]." In addition, OCRM may consider "an alternate alignment if site specific characteristics warrant or in the case of dock master plans, when appropriate." 23A S.C.Code Ann. Regs. 30–12(A)(2)(e) (Supp.2004).

Joyner testified that the corridors for the DMP were chosen by the developer, not the agency. The record includes evidence that after Moore received his original permit for the location set forth in the DMP, he experienced difficulty in getting his boat to the permitted area unless it was very close to high tide. He even ran aground on high tide because of a large shell bank. In addition, as noted above, OCRM has changed its policy and has been trying to "get out of the business" of issuing permits to docks in such small creeks because of the resulting disturbance to the highly productive fishery habitats docks cause on small tidal creeks. Accordingly, we find substantial evidence supports the ALC's finding

that the agency's use of an alternative alignment in the amended permit was warranted under the facts of this case.

## VI. Violation of Reg. 30–11(B)(10)

The Joneses next assert the ALC erred in finding that Regulation 30–11(B)(10) was not violated because the proposed dock affects their use and enjoyment as adjoining land owners. In particular, they argue it would affect Jones' enjoyment because he liked to put his kayak and canoe in the tidal areas and marshland, and allowing the proposed dock would block his navigation and access. They likewise assert the proposed dock would negatively impact their ability to get supplies to their dock as it would prevent their son from navigating his powerboat from their dock on the Wando to the edge of their lot, in order to transport the heavy supplies. Finally, they argue, while they do not have a prescriptive right to an unobstructed view of the marsh, it is a factor to be considered pursuant to this regulation.

Section 48–39–150(A)(10) of the South Carolina Code provides, in determining whether to approve or deny a permit application, OCRM is to base its decision on the individual merits of each application, the policies specified in South Carolina Code sections 48–39–20 and 48–39–30, and specified statutory general considerations, including "[t]he extent to which the proposed use could affect the value and enjoyment of adjacent owners." S.C.Code Ann. § 48–39–150(A)(10) (2008). South Carolina Code of Regulations section 30–11(B) includes the same general considerations as section 48–39–150 of the Code, with Regulation 30–11(B)(10) likewise providing OCRM must consider "[t]he extent to which the proposed use could affect the value and enjoyment of adjacent owners." 23A S.C.Code Ann. Regs. § 30–11(B)(10) (Supp.2008). "After considering the views of interested agencies, local governments and persons, and after evaluation of biological and economic considerations, if the department finds that the application is not contrary to the policies specified in this chapter, it shall issue to the applicant a permit." S.C.Code Ann. § 48–39–150(B) (2008).

First, as previously noted, there is substantial evidence of record the proposed walkway will not cross any creeks consid-

ered navigable. While the Joneses may very well have been able to navigate though the smaller tributaries at higher water levels to their highland near the bridge leading to their island, some of this area has been described at times as a mud flat and as being "flat as a pancake." While the Joneses may very well have been able to navigate through these tributaries at certain times, this alone does not make the tributaries navigable. In fact, there is testimony that on a spring tide, full moon tide, or even simply a high tide, one could navigate some type of watercraft in the majority of the marsh area, not just the small tributaries. Further, especially in light of the requirement that the proposed walkway be elevated to five feet above mean high water, it clearly will not restrict the Joneses' access by kayak or canoe to the smaller tributaries. Additionally, we agree with the ALC that Justin might also be able to maneuver his power boat under the raised walkway and, even assuming he could not, this limitation is more reflective of a lack of convenience than an inability to use the Joneses' property, as the amended permit will not impact their deep water access from their dock off their island. Finally, at the time of the hearing the Joneses had not even built a home on their property, and there is no evidence whatsoever that the amended permit would in any way obstruct the Joneses' view. As noted by the ALC, the extent to which the proposed use could affect the value and enjoyment of the adjacent landowners is but one of many factors to consider. We find substantial evidence of record supports the ALC's finding that the impact on the Joneses' use and enjoyment of their property is outweighed by the justification for granting the amended permit.

## VII. Due Process

The Joneses also contend the ALC erred in ruling their due process rights were not violated in this matter. They complain that notice of the initial denial of the amended permit was sent to them, and two months later a letter was sent only to Moore's agent indicating the denial was a mistake and the permit was issued shortly thereafter. They argue OCRM had no authority to change its publicly noticed decision to deny the amendment with "no re-application, no notice and no procedure other than simply issuing the approval." The

Joneses assert this lack of notice constitutes a violation of due process. We disagree.

In considering a similar issue in a dock permitting case, this court stated as follows:

> "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment of the United States Constitution." *Kurschner v. City of Camden Planning Comm'n,* 376 S.C. 165, 171, 656 S.E.2d 346, 350 (2008). "Due process requires (1) adequate notice; (2) adequate opportunity for a hearing; (3) the right to introduce evidence; and (4) the right to confront and cross-examine witnesses." *Clear Channel Outdoor v. City of Myrtle Beach,* 372 S.C. 230, 235, 642 S.E.2d 565, 567 (2007). Procedural due process requirements are not technical, and no particular form of procedure is necessary. *Sloan v. S.C. Bd. of Physical Therapy Exam'rs,* 370 S.C. 452, 485, 636 S.E.2d 598, 615 (2006). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Id.* The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *S.C. Dep't. of Soc. Servs. v. Beeks,* 325 S.C. 243, 246, 481 S.E.2d 703, 705 (1997). To prevail on a claim of denial of due process, there must be a showing of substantial prejudice. *Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 435, 319 S.E.2d 695, 698 (1984).

*Olson v. S.C. Dep't of Health & Envtl. Control,* 379 S.C. 57, 68–69, 663 S.E.2d 497, 503–04 (Ct.App.2008). In *Olson,* we found no violation of the adjoining landowners' due process rights where they failed to receive direct notice of a dock permit amendment application considered by OCRM. Specifically, we noted the adjoining landowners appealed the agency's decision to issue the amended permit one month after it was issued, a full hearing was held before the ALC where the adjoining land owners challenged the permit, and the landowners participated extensively in the hearing, eliciting testimony, presenting evidence, and confronting witnesses. *Id.* As with the adjoining landowners in the *Olson* case, the Joneses have

likewise participated extensively in the hearing, thus receiving an opportunity to be heard at a meaningful time and in a meaningful manner. Furthermore, as in *Olson*, no prejudice resulted to the Joneses as they received sufficient notice of the actions of OCRM such that they were able to obtain a hearing before the ALC providing them the opportunities required by due process. *Id.* at 69, 663 S.E.2d at 504. Accordingly, the Joneses' due process argument also fails.

## VIII. Appeal of Dock Master Plan decision of March 9, 2004

 The Joneses next assert the ALC erred in finding the DMP was not violated. In making this argument, they do not explain how the ALC erred, but simply summarily contend there is no justifiable reason to move the corridor previously approved in the DMP.[3] We find the Joneses have abandoned this issue on appeal as their argument is conclusory and unsupported by authority. *See Bennett v. Investors Title Ins. Co.*, 370 S.C. 578, 579, 635 S.E.2d 649, 660 (Ct.App.2006) (noting an issue is abandoned on appeal when the appellant fails to cite any supporting authority for his position and makes only conclusory arguments); *First Sav. Bank v. Mc-Lean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (deeming an issue abandoned because the appellant failed to provide pertinent argument or supporting authority).

## IX. Finality of OCRM decision

 The Joneses argue that when OCRM issued a letter in September of 2004 stating Moore's amendment request was denied, this operated as a final agency decision. They assert that when Moore failed to appeal the decision to the ALC within thirty days as provided by Rule 11, SCRALC, this decision became final and OCRM was without authority to reverse its decision.

---

**3.** The Joneses spend the majority of their short argument on this issue maintaining this is a final agency decision which is contestable based upon a letter from OCRM dated March 9, 2004 regarding a previously requested revision of the DMP as related to lot 38. The record clearly demonstrates, however, that the ALC sustained Moore's hearsay objection to the document and admitted it solely as "evidence of what is in the Department's file." Accordingly, this letter is not proper evidence before this court for consideration in the manner the Joneses propose.

Curtis Joyner testified that when he was considering Moore's permit amendment, he was undecided on what he was going to do so he drafted both a denial letter and an amendment letter. Moore's attorney contacted him and asked for him to refrain from making a decision and Joyner agreed to a delay. The denial letter, however, was mailed out inadvertently. OCRM's Office of General Counsel sent a letter to Moore's attorney explaining that although Joyner intended to issue the permit to Moore, a notice of denial letter was mistakenly mailed to the adjacent property owners. The General Counsel stated, "This denial letter was a draft and not intended as the agency's final administrative decision in this case."

 It is evident from the record that the denial letter sent to the Joneses in September of 2004 was merely a draft and never was intended to constitute a final agency decision. Furthermore, as the ALC found, an agency may reconsider its decision when there is justification and good cause, which includes mistake. *Bennett v. City of Clemson*, 293 S.C. 64, 66–67, 358 S.E.2d 707, 708–09 (1987). Thus, under *Bennett*, OCRM may reconsider a decision that was based on a mistake. Accordingly, we hold OCRM acted within its authority in issuing the permit amendment approval in December 2004.

## X. Circuit Court decision

Finally, the Joneses contend the circuit court erred "in finding there was no error of law in which to reverse the decision of [the ALC]," and that the arguments made on appeal demonstrate numerous errors.

As noted above, we believe there is substantial evidence of record to support the findings of the ALC and discern no errors of law committed by the ALC.

## CONCLUSION

Based on the foregoing, the decision of the ALC is

**AFFIRMED.**

PIEPER, J., and GOOLSBY, A.J., concur.